R.M.S. TITANIC, INC., successor-in-interest to Titanic Ventures, limited partnership, Plaintiff,

v.

The WRECKED AND ABANDONED VESSEL, Its Engines, Tackle, Apparel, Appurtenances, Cargo, etc., Located Within One (1) Nautical Mile of a Point Located at 41 43′ 32″ North Latitude and 49 56′ 49″ West Longitude, Believed to be the R.M.S. Titanic, In Rem, Defendant.

No. 2:93cv902.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 12, 2010.

Brian Andrew Wainger, RMS Titanic Inc., Virginia Beach, VA, Matthew D. Pethybridge, Carr & Porter LLC, Portsmouth, VA, Robert William McFarland, McGuirewoods LLP, Norfolk, VA, David J. Bederman, Emory University School of Law, Atlanta, GA, for Plaintiff.

## OPINION

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on R.M.S. Titanic, Inc.'s ("RMST") Motion for a Salvage Award ("Motion") filed on November 30, 2007.[1] The court held an evidentiary hearing on RMST's Motion on October 26–29, 2009, and on November 2 and 23, 2009. For the reasons set forth below, the court **GRANTS** RMST's motion for a salvage award in the amount of **ONE HUNDRED PERCENT** (100%) the fair market value of the artifacts recovered in the 1993, 1994, 1996, 1998, 2000, and 2004 expeditions to the wreck of the *R.M.S. Titanic.* The court specifically reserves the right to determine at a later time whether to pay such award in currency or via an *in specie* award.

### I. Factual and Procedural History

It has been nearly one hundred years since the *R.M.S. Titanic* ("Titanic") sank in the waters of the North Atlantic in the early hours of April 15, 1912, killing more than 1,500 of the 2,228 people onboard. For over half a century, the Titanic lay undetected, 12,500 feet below the surface, in international waters four hundred nautical miles southeast of Newfoundland, until a joint American–French expedition discovered the wreck in 1985.

In 1987, RMST's predecessor-in-interest, Titanic Ventures Limited Partnership ("TVLP"), participated in a joint expedition with the Institut français de recherche pour l'exploitation de la mer ("IFREMER") to begin salvage operations at the site. Over the course of thirty-two dives to the Titanic wreck, TVLP recovered approximately 1,800 artifacts ("1987 artifacts"), which were taken to France for conservation and restoration.[2]

On May 4, 1993, RMST, formerly known as First Response Medical, Inc., acquired all the assets and liabilities of TVLP, including TVLP's interest in the Titanic salvage operations and the 1987 artifacts. In the summer of that year, RMST conducted another expedition to the Titanic wreck site, pursuant to a charter with IFREMER,[3] recovering approximately 800 artifacts ("1993 artifacts") and producing 105 hours of videotape over the course of fifteen dives. After bringing the 1993 artifacts to Norfolk, Virginia, RMST commenced the current *in rem* action on August 26, 1993.

The court issued a warrant directing the United States Marshal to arrest the wreck and all the artifacts that had already been salvaged and that were yet to be salvaged. The court also ordered that RMST be substituted for the Marshal as custodian of the Titanic wreck, the wreck site, and the artifacts. Formal notice of the court's order appeared in *The Virginian–Pilot, The Wall Street Journal,* and *The Journal of Commerce,* directing persons who had any

---

1. The progression of the case since the filing of the instant Motion is set forth *infra* Part I. at 10–14.

2. The number of artifacts listed for each expedition is approximate, as the data sometimes varies, depending on whether related objects are counted as a group or individually.

3. As RMST did not own the expensive and highly technical equipment necessary to salvage the Titanic wreck site, it entered into a series of charter agreements to make its salvage operations possible. Those charter agreements are discussed more fully below. *See infra* Part II.B.4. and 5.

claim to the wreck, or any of the associated property, to appear and state their claims. The only party to file a claim was Liverpool and London Steamship Protection and Indemnity Association Limited ("Liverpool & London"), which had insured passenger personal property and baggage on board the Titanic.

On October 20, 1993, a French administrator in the Office of Maritime Affairs of the Ministry of Equipment, Transportation, and Tourism awarded TVLP title to the 1987 artifacts. The 1987 artifacts are not included in the present Motion.[4]

After RMST reached a settlement agreement with Liverpool & London, the court dismissed Liverpool & London's claim on June 7, 1994. By separate order that same day, the court awarded RMST exclusive rights to salvage the Titanic wreck as salvor-in-possession. Thus, in the summer of 1994, RMST and IFREMER conducted another expedition to the wreck, recovering over 1000 more artifacts ("1994 artifacts") and producing approximately 125 hours of videotape.

Pursuant to Federal Rule of Civil Procedure 60(b), John Joslyn ("Joslyn") filed a motion on February 20, 1996, asking the court to reconsider the June 7, 1994, Order making RMST salvor-in-possession. Joslyn argued that RMST was not fulfilling its duty as salvor-in-possession on the grounds that RMST had not made an expedition to the site in nearly two years and that it did not have the financial means to do so. On May 10, 1996, the court upheld RMST's status as salvor-in-possession in a Memorandum Opinion and Order, finding RMST had exercised due diligence, had maintained ongoing salvage operations, and had demonstrated its efforts were clothed with a prospect of success. *R.M.S,*

*Titanic, Inc. v. Wrecked & Abandoned Vessel,* 924 F.Supp. 714, 722–724 (E.D.Va. 1996). The court's holding was partially based on the fact that RMST had "promised the Court that it would keep the artifacts together and preserve them for the public," and, at least until that point, RMST had kept that promise. *Id.* at 723.

RMST's 1996 expedition to the Titanic, again in conjunction with IFREMER, led to the recovery of 74 artifacts ("1996 artifacts") and the production of approximately 125 hours of videotape. With the cooperation of RMST, Discovery Communications, Inc. ("Discovery") joined the expedition, from which it produced three hours of television programming for The Discovery Channel.[5] Also on the 1996 expedition, efforts began to recover a section of the Titanic hull, known as the "Big Piece," measuring approximately 26 feet by 20 feet and weighing approximately 20 tons. Nevertheless, efforts to raise the Big Piece on the 1996 expedition were ultimately unsuccessful.

In the summer of 1998, pursuant to another charter with IFREMER, RMST returned to the Titanic site, recovering approximately 70 artifacts ("1998 artifacts"), which included the Big Piece, and producing 350 hours of videotape. Once again, Discovery joined the expedition, producing five hours of television programming, which included the first-ever live broadcast from the Titanic wreck site.

On May 4, 1998, RMST sought an injunction to prohibit Deep Ocean Expeditions ("DOE") from organizing tourist expeditions to the Titanic wreck site for the purposes of photographing it. That same day, Christopher Haver ("Haver"), an individual who had paid DOE $32,000 to par-

---

**4.** *See infra* note 7 and accompanying text.

**5.** The two-hour feature, "TITANIC: Anatomy of a Disaster," was the highest rated program in the history of The Discovery Channel as of its airing in April 1997.

ticipate in such an expedition, filed an action in this court seeking a declaratory judgment that he was entitled to enter the Titanic wreck site. After consolidating Haver's action with this *in rem* proceeding, the court granted RMST's motion for an injunction on June 23, 1998, enjoining DOE, Haver, and others from photographing the Titanic wreck. The court found an injunction necessary, in part, to compensate RMST for its efforts as salvor-in-possession, given that RMST could not sell the artifacts in its care. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 9 F.Supp.2d 624, 636 (E.D.Va.1998). On appeal, the Fourth Circuit reversed the court's decision to grant an injunction, holding that the court could not enjoin DOE, Haver, and others from traveling to and photographing the Titanic wreck. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 970 (4th Cir.1999) (*"Titanic 1999"*). The Fourth Circuit affirmed, however, this court's decision to name RMST as salvor-in-possession. *Id.* at 966. On remand, this court entered an order consistent with the Fourth Circuit's ruling, monitoring RMST's salvor-in-possession status with periodic reports and hearings. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, No. 2:93cv902 (E.D.Va. July 7, 1999).

RMST completed another expedition to the Titanic wreck site in the summer of 2000, in conjunction with the P.P. Shirshov Institute of Oceanology of Moscow, Russia ("Shirshov Institute"), which provided the research vessel "Akademik Mstislav Keldysh" and two deep manned submersibles, the "MIR–1" and the "MIR–2." The 2000 expedition consisted of twenty-eight dives and resulted in the recovery of over 900 artifacts ("2000 artifacts"), as well as the discovery of a new debris field.

In the summer of 2001, the court learned that RMST had plans to transfer interest in the Titanic artifacts. After holding a hearing, the court issued an order on September 26, 2001, finding that its previous orders to prevent sales of individual Titanic artifacts "were proper and were necessary when entered." *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, No. 2:93cv902, at 2 (E.D.Va. Sept. 26, 2001) (*"Titanic 2001"*).[6] After RMST appealed the September 26, 2001, Order, the court amended that order on October 19, 2001, to further explain its position. RMST then filed an amended notice of appeal, appealing both orders. The Fourth Circuit held an expedited hearing on the matter, and on June 6, 2002, affirmed the position of the court:

> The *Titanic* was a historic ship, and the artifacts recovered from its wreckage therefore have enhanced value. RMST currently has a unique role as the *Titanic's* exclusive salvor, and, having performed salvage services, it has a lien in the artifacts and is entitled to a reward enforceable against those artifacts. At

**6.** In particular, on July 28, 2000, the court ordered that RMST could not "sell or otherwise dispose of any artifacts or any object recovered from the TITANIC wreck site." *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, No. 2:93cv902, at 3 (E.D.Va. July 28, 2000). The court further ordered that RMST was "forbidden to in any way cut into the wreck or detach any part of the wreck." *Id.* On April 30, 2001, the court amended the July 28, 2000, Order, clarifying that RMST remained free to sell coal recovered from the wreck site. *R.M.S. Titanic, Inc.* *v. The Wrecked & Abandoned Vessel*, No. 2:93cv902, at 2 (E.D.Va. Apr. 30, 2001). On April 30, 2010, the court issued a Memorandum Order again amending the July 28, 2000, Order, to permit, in connection with the planned 2010 expedition, the limited collection of "rusticles," which are complex microbiological structures that feed on the ship's iron, for the purposes of scientific research. *See R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, No. 2:93cv902, at 3 (E.D.Va. Apr. 30, 2010); *infra* note 27.

this stage of the proceedings, however, we cannot conclude that RMST has title to any artifacts. We also cannot conclude that the course that the district court is pursuing violates the law of salvage or amounts to an abuse of discretion.

*R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 286 F.3d 194, 210 (4th Cir. 2002) (*"Titanic 2002"*).

On February 12, 2004, RMST filed a "Motion for Salvage and/or Finds Award," pursuant to which the court held a hearing on May 17, 2004. In a Memorandum Opinion and Order, dated July 2, 2004, the court refused to recognize the French administrative judgment awarding title of the 1987 artifacts to RMST's predecessor, under principles of international comity. *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel,* 323 F.Supp.2d 724, 730–34 (E.D.Va.2004) (*"Titanic 2004"*). Moreover, the court held that RMST, as salvor-in-possession, could not seek title to the artifacts under the law of finds because it would be "inequitable and inconsistent" for the court "to award a party both the exclusive right to recover objects on the premise that the recovery is being performed for the benefit of the objects' owners, and to award title to the objects once they are recovered on the premise that they were previously unowned." *Id.* at 737. On August 2, 2004, the court issued an order staying its proceedings pending RMST's interlocutory appeal. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 327 F.Supp.2d 664, 666–67 (E.D.Va. 2004).

In the summer of 2004, RMST conducted its most recent expedition to the Titanic wreck site, pursuant to charters with Phoenix International, Incorporated ("Phoenix International") and Secunda Marine Services Limited ("Secunda Marine"). For the first time, RMST relied exclusively on a deep ocean remotely operated vehicle ("ROV"), which permitted round-the-clock underwater operations. The expedition resulted in the recovery of 75 artifacts ("2004 artifacts"), as well as the discovery of another debris field, with remnants of the first class à la carte restaurant.

In 2006, on appeal of this court's decision in *Titanic 2004,* the Fourth Circuit affirmed this court's ruling that it is the law of salvage and not the law of finds that governs this case. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 435 F.3d 521, 535 (4th Cir.2006) (*"Titanic 2006"*),[7] The Fourth Circuit remanded the case to this court to provide RMST with "an appropriate reward, which may include awards *in specie,* full or restricted ownership of artifacts, limitations on use of the artifacts, rights to income from display and shared research, and future rights to salvage." *Id.* at 538.

On October 1, 2007, the court conducted a status hearing, and on October 16, 2007, the court issued a Memorandum Opinion and Order directing RMST to file a motion for a salvage award within sixty days, including all salvage costs through December 31, 2006, or RMST would waive the right to a salvage award up to and including that date. *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel,* 531 F.Supp.2d 691, 693 (E.D.Va.2007) (*"Titanic 2007"*). Further, the court entrusted the United States Attorney for the Eastern District of Virginia to continue reviewing RMST's operations as salvor-in-posses-

---

7. The court of appeals did vacate that portion of the court's opinion dealing with the 1987 artifacts, finding that the court lacked *in rem* jurisdiction over the 1987 artifacts. *Titanic* *2006,* 435 F.3d at 530. RMST had previously been awarded title to the 1987 artifacts in a French administrative proceeding. *See supra* note 4 and accompanying text.

sion, as well as responding to any motion for salvage award RMST might file. *Id.*

On November 30, 2007, RMST filed the instant Motion, along with several volumes of exhibits, seeking a salvage award for all of its efforts salvaging the Titanic wreck site through December 31, 2006.[8] In the Motion, RMST represented that the fair market value of the artifacts at that time, excluding the artifacts from the 1987 expedition, was $110,859,200. (Motion ¶ 10.) RMST further stated that it was seeking a salvage award between ninety to one hundred percent of the artifact's fair market value. (*Id.* ¶ 11.)

After receiving an extension of time from the court, on March 17, 2008, the United States filed a motion seeking leave of the court to submit its views on RMST's Motion. With written consent from RMST, the court granted the United States' request, on March 25, 2008, to participate as *amicus* and ordered that the United States' *amicus* brief be filed. In its brief, the United States indicated that "an interim *in specie* award with limitations could serve as an appropriate award mechanism in this case," and therefore, the United States proposed certain limitations for the court's consideration. (United States' Resp. to RMST's Motion for Salvage Award at 10–16 (Mar. 17, 2008).)

On April 15, 2008, the court issued an order directing RMST to submit proposed restrictive covenants. The court stated:

At minimum, these proposed covenants must ensure that the artifacts are conserved and curated in an intact collection that is available to the public and accessible for historical research, educational purposes, and scientific research, in perpetuity. The proposed

covenants shall incorporate safeguards to ensure that they will remain effective in perpetuity, notwithstanding any further changes in circumstances. Furthermore, the proposed covenants shall guard against contingencies that might impair their future effectiveness.

*R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel,* No. 2:93cv902, at 6 n. 12 (E.D.Va. Apr. 15, 2008). With regard to the content of the covenants, the court indicated:

Specifically, these covenants, at minimum, must ensure the following: (1) that the collection is maintained as an intact collection that joins those artifacts from the *R.M.S. Titanic* awarded to RMST by a French maritime tribunal; (2) that the collection is managed according to the professional standards recognized in the NOAA Guidelines, the International Agreement and the Annexed Rules, and the federal regulations governing the curation of the federally owned and administered archaeological collections; (3) that reasonable, ongoing oversight by NOAA is implemented in order to protect the United States' interests in the *Titanic* wreck site and the artifacts recovered therefrom, and to ensure compliance with all court-imposed covenants; (4) that the collection is protected in perpetuity by ensuring that the covenants run with the collection to any subsequent purchasers and/or successors-in-interest to RMST; and (5) that the collection is protected in the event of insolvency or bankruptcy by RMST.

*Id.* at 4–5 (footnotes omitted). Further, the court stressed that the covenants would need to protect the Titanic and its

---

**8.** RMST specifically reserved the right to pursue successive salvage awards for operations subsequent to January 1, 2007. (Motion ¶ 17.) To date, RMST has conducted no further salvage operations or expeditions to the

site. However, as indicated in its most recent Periodic Report to the court, dated August 10, 2010, an expedition is set to begin on August 18, 2010. (Periodic Report Ex. B at 1 (Aug. 10, 2010).)

artifacts as an international treasure for posterity, as expressed by the *R.M.S. Titanic* Maritime Memorial Act of 1986, 16 U.S.C. § 450rr *et seq.*, the National Oceanic and Atmospheric Administration's ("NOAA") Guidelines for Research, Exploration, and Salvage of *R.M.S. Titanic*, 66 Fed.Reg. 18,905–18,913 (Apr. 12, 2001), the International Agreement Concerning the Shipwrecked Vessel *R.M.S. Titanic*, and the proposed legislation to implement the International Agreement. *Id.* 3–4.

RMST submitted its proposed covenants and conditions ("C & Cs") on June 11, 2008, and a revised version on June 23, 2008. After extensive consultation with the United States, RMST submitted another revised version of the C & Cs on September 12, 2008, in compliance with the court's schedule.[9] Generally, the C & Cs provide for oversight by NOAA, extensive trustee obligations, a reserve fund, trustee default procedures, collection management, deaccession, bankruptcy procedures, and possible sale in the event of a rival collection. On October 14, 2008, the United States filed its *amicus* response to the C & Cs, which approved of most provisions, objected to several provisions, and attached an edited version of the C & Cs. The court granted RMST leave to reply to the United States' concerns.

At a hearing on November 18, 2008, the parties addressed the disputed issues, and the court oversaw further revisions. Specifically, the parties agreed to alter language about the trustee's obligations, deaccession, the reserve account, and the bankruptcy proceedings; delete a section about selling the collection if a rival collection emerges; and incorporate extrinsic sources. Taking into account these revisions, the court is satisfied that the current version of the C & Cs complies with the court's order dated April 15, 2008.[10]

Finally, pursuant to the instant Motion for a Salvage Award, the court conducted an evidentiary hearing on October 26–29, 2009, and on November 2 and 23, 2009. On December 21, 2009, RMST submitted its Post–Hearing Memorandum in Support of its Motion for a Salvage Award. The United States opted to make no further submissions to the court. After almost seventeen years since the commencement of this *in rem* action, RMST's Motion for an interim salvage award is ripe for decision.

## II. Analysis

### A. Entitlement to a Salvage Award

■■ Principles of salvage law emerged over three thousand years ago, in the days of Rhodian civilization, and have since become an important part of the maritime law of nations. The purpose of salvage law is "to encourage persons to render prompt, voluntary, and effective service to ships at peril or in distress by assuring them compensation and reward for their salvage efforts." *Titanic 1999*, 171 F.3d at 962 (citing *The Akaba*, 54 F. 197, 200 (4th Cir.1893)). In that regard, a salvage award "is not viewed by the admiralty courts merely as pay, on the principle of a *quantum meruit*, or as a remuneration PRO OPERE ET LABORE, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *The Blackwall*, 77 U.S. (10 Wall) 1, 14, 19 L.Ed. 870 (1869). Thus, in order to encourage salvage operations, a salvor is entitled to "liberal compensation." *Id.*

■■ Rather than obtaining title to the salvaged property, a salvor acts on behalf of the property's owner, thereby obtaining a lien against the property saved. *The*

---

**9.** This submission was not docketed, however, until September 15, 2008.

**10.** This version is attached to this Opinion as Exhibit A.

"Sabine", 101 U.S. 384, 386, 25 L.Ed. 982 (1879). The salvor's lien is exclusive and prior to all others, including the res owner, and it grants the salvor a possessory interest in the res pending satisfaction of the lien. *Titanic 1999,* 171 F.3d at 963. A salvor may enforce its lien on the salved property by pursuing an *in rem* action before an admiralty court. *Id.*

 A salvor must establish three elements to prove entitlement to a salvage award: (1) that the salved property faced a marine peril; (2) that the salvor's services were voluntarily rendered without any preexisting contractual obligation; and (3) that the salvage efforts were successful, in whole or in part. *The "Sabine",* 101 U.S. at 384. If any ambiguity still remains as to whether RMST has demonstrated these elements, the court explicitly finds that the prerequisites to a salvage award have been satisfied and that a salvage award is, therefore, warranted in this case. *See Titanic 2006,* 435 F.3d at 538 (directing this court on remand to "apply the principles of traditional salvage law to the wreck of the *Titanic* in a manner that . . . provides an appropriate award to the salvor").

 First, there can be little doubt that the Titanic, which now lies 12,500 feet below the surface, has faced, and continues to face, marine peril. *See, e.g., Bemis v. RMS Lusitania,* 884 F.Supp. 1042, 1051 (E.D.Va.1995) ("Courts will usually find that underwater shipwrecks are in marine peril, because sunken vessels and their cargoes are in danger of being lost forever." (citing *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 569 F.2d 330, 336–37 (5th Cir. 1978))). Second, RMST's salvage efforts were voluntary, in that RMST owed no

contractual duty to perform the salvage. Last, RMST's efforts have been successful in retrieving thousands of artifacts from the wreck site. Thus, having determined a salvage award is appropriate, the court must now determine the amount of that award.

### B. Factors to be Considered in Calculating the Salvage Award

 There is no precise formula for calculating a salvage award. *Allseas Maritime, S.A. v. M/V Mimosa,* 812 F.2d 243, 246 (5th Cir.1987). Because salvage cases are rarely alike, comparisons to previous awards are of little help, and the court must instead focus on the particular circumstances of the case at hand. *See B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 339–40 (2d Cir.1983) (citations omitted).[11] In the Fourth Circuit, the fashioning of a salvage award is informed by seven factors, including six factors drawn from *The Blackwall:* (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. 77 U.S. (10 Wall) at 14. In *Columbus–America Discovery Group v. Atl. Mut. Ins. Co.,* 974 F.2d 450 (4th Cir. 1992) ("*Columbus–America I*"), the Fourth Circuit added a seventh factor: "the degree to which the salvors have worked to protect the historical and ar-

---

11. Although the court heard testimony comparing RMST's salvage operations to those involved in the *Columbus–America* case, the court has fashioned the *amount* of the present salvage award based upon the merits of RMST's efforts. *See infra* note 35 and accompanying text.

cheological value of the wreck and the items salved." *Id.* at 468.

■ When calculating a salvage award, "the court of admiralty becomes a court of equity," such that the award "may properly be increased, diminished, or wholly forfeited, according to the merit or demerit of the salvor, in relation to the property saved." *Id.* (citations omitted). The amount of the salvage award "is primarily a matter of judgment to be exercised by the trial court, and, beyond a careful examination of the facts, little remains for the appellate court except to determine whether the judgment has been exercised in accordance with the general principles respecting salvage." *Columbus–America Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 569 (4th Cir.1995) ("*Columbus–America II*") (citation omitted). Thus, appellate courts apply an "extremely deferential standard of review" to salvage awards. *Id.*

■ Traditionally, the maximum amount that a court would award for a successful salvage was the present market value of the salved property. *See Platoro Ltd., Inc. v. The Unidentified Remains of a Vessel*, 695 F.2d 893, 904 (5th Cir.1983). Any award higher than that value would have burdened rather than benefited the property's owner, a "result contrary to the goals of salvage law." *Id.* (citation omitted). Nevertheless, the Fourth Circuit has held, "[i]f it becomes apparent to the court that the proceeds of any sale would clearly be inadequate to pay the salvor its full reward, then the court might, as a matter of discretion, award the salvor title to the property in lieu of the proceeds of sale, thus saving the costs of sale." *Titanic 2002*, 286 F.3d at 204. Because whether to grant title is a matter of discretion for the court, the court must first determine the amount of the award and then determine how it ought to be paid.

## 1. The Value of the Property Saved (*Blackwall* Factor 5) [12]

When performing its analysis under *The Blackwall* factors, the court need only determine "a rough approximation of the worth of the salved property." *Rand v. Lockwood*, 16 F.2d 757, 759–60 (4th Cir. 1927). The salved property currently before the court includes all artifacts RMST recovered over the course of six expeditions: 1993, 1994, 1996, 1998, 2000, and 2004 (collectively, the "artifacts").[13] If the court decides to grant a monetary award, the ceiling for such an award would be the fair market value of the artifacts currently before the court. *See Platoro*, 695 F.2d at 904.

■ According to RMST's experts, Paul Zerler ("Zerler") and Stephen Rogers ("Rogers") (collectively, the "appraisers"), the fair market value of the artifacts is currently over one hundred and ten million dollars. (*See* RMST Evid. Hr'g Ex. 50 at 18 ("2009 Update").)[14] That current valuation represents an update of their original appraisal, which began in 2000 and took approximately three and a half years to complete. In performing their initial appraisal, Zerler and Rogers took a "bottom-up" approach, individually inspecting almost every Titanic artifact.

12. As the value of the property saved determines the maximum salvage award, the court begins with *Blackwall* factor 5, and then proceeds to consider the remaining factors.

13. The 1987 artifacts are not before the court. *See supra* notes 4 and 7 and accompanying text.

14. As previously indicated, the court held an evidentiary hearing on RMST's Motion for a Salvage Award on October 26–29, 2009, and on November 2 and 23, 2009. The RMST evidentiary hearing exhibits referred to by the court were all admitted into evidence over the course of that hearing.

(Zerler Decl. ¶ 5 (Nov. 28, 2007) (hereinafter "Zerler Decl.").) The value of each object was determined based upon "the character of the object, its state of conservation, the scarcity of the item, and other relevant factors." (*Id.*) Although the appraisers determined fair market value by comparing the artifacts to "other reasonably comparable assemblages of artifacts and collectibles, ... because of the uniqueness of these artifacts, there are no precise comparables." (*Id.*) Because the artifacts before the court are the only ones to originate from the Titanic wreck site, the appraisers believe that the artifacts are worth more as a collection than individually. (*See id.*)

In 2007, Zerler and Rogers generated an updated appraisal based upon the values established in the original report ("2007 Update"). (*See id.* Ex. B.) The 2007 Update removed the 1987 artifacts, added the 2004 artifacts, and updated the appraisal figures to reflect market conditions. The appraisers determined that the 1993–2002 artifacts had doubled in value since their initial appraisal. (*Id.* Ex. B. at "2007 Update Addendum with 2004 Expedition Added.")[15] The 2004 artifacts were then appraised by multiplying the 2002 valuation of comparable artifacts by one hundred fifty percent. (*Id.*) The appraisers justified the increases based on the "art market, the collectables market, the notoriety of the Titanic, the mystery of the Titanic and the fact that it has become a household word and a metaphor for great or major tragedies or mistakes." (*Id.*) The increase is also due, in part, to increased notoriety following numerous exhibitions of the artifacts. (*See id.* at App. A at "Titanic Artifact Appraisal Summary" (2007).)

The 2009 Update, other than correcting a relatively small error in calculation, maintains the findings of the 2007 Update, valuing the collection at $110,859,200. (2009 Update at 18.) The appraisers are of the opinion that the "current financial market volatility does not appear to be affecting unique, high end collectible values." (*Id.*) As evidence, the appraisers provide recent sales data from unique collectibles, including items from the Titanic that were recovered either from survivors or from the ship's flotsam and jetsam.[16] Among those items, the key to the E–Deck of the Titanic recently sold, in April 2009, for £60,000 (approximately $90,000). (2009 Update at 16.) A third-class manifest sheet, written in eight languages, also sold in 2009 for £23,000 (approximately $34,000). (*Id.* at 14.) In September 2007, the key to the ship's crow's nest sold for £90,000 (approximately $145,000). (*Id.* at 16.)

The appraisers were careful to emphasize, however, that even these items from the Titanic are not directly comparable to the artifacts before the court. Zerler and Rogers assert that the carefully documented provenance of each artifact recovered from the wreck site drives up that artifact's value by a factor of ten, over any comparable item. (*Id.* at 6.) Nevertheless, the appraisers maintain that the "current valuation of the collection remains extremely conservative, and may be seen as a bottom beneath which lower valuation does not appear feasible." (*Id.* at 10.)

The current valuation excludes RMST's "hard costs," such as the cost of salvage, preservation, lab operation, exhibition, and storage, as well as the value of slides and

---

**15.** The appraisers used as a baseline the value of the artifacts in 2002, after their preservation. The artifacts' value before preservation, i.e., as originally salvaged, is approximately sixty percent of their value as preserved. (Zerler Decl. Ex. B. at App. A.)

**16.** Jetsam are items that are thrown from the ship in attempts to save the ship, whereas flotsam are items that float off the ship during the sinking.

video films. (*Id.* at 18.)[17] The appraisers indicate those costs could be an additive to the current valuation of as much as $44,000,000 (as of 2007). (*Id.*) Moreover, Zerler and Rogers properly assumed, for purposes of the appraisal, that the artifacts would stay together as a collection and that none of the artifacts would be sold, either individually or in groups. (*Id.* at 10–11.)

As evidence of the reliability of the Zerler–Rogers appraisal, RMST also submitted the report and testimony of Richard–Raymond Alasko ("Alasko"), an accredited senior appraiser for the American Society of Appraisers and principal in the Alasko Company. In the report, Alasko "confirms the reliability of the Zerler–Rogers conclusion of the Fair Market Value of the subject properties as $110,859,200 on 23 October 2009." (RMST Evid. Hr'g Ex. 52 at 22.) At the evidentiary hearing, upon questioning by the court, Alasko testified that he believed, were the court to hire an independent expert to value the collection, that the valuation would be substantially similar to that of Zerler and Rogers.

The court recognizes the inherent difficulty in placing a fair market value on a collection of artifacts that has no real market equivalent. However, other methods of valuation are equally unsatisfactory, as there is no way to calculate the replacement cost of an irreplaceable collection. Similarly, the income method would overlook the intrinsic value of ownership, independent of income potential, possessed by truly rare historic and artistic collections. In the absence of a more attractive alternative, the court embraces the fair market value approach taken by the appraisers.

Under *The Blackwall* factors, the court is charged with determining a "rough approximation" of the value of the property saved. *Rand,* 16 F.2d at 759–60. In assessing the reliability of the submitted appraisal, the court notes that Zerler has been a renowned appraiser of artifacts, fine art, and collectibles for over forty-two years. (2009 Update at 3.) Along with Rogers, Zerler spent over 3600 hours valuing the Titanic artifacts. (Zerler Decl. Ex. B. at "Appraisal of Artifacts from the *Wreck R.M.S. Titanic* September 2000–June 2004 with 2007 Update Supplement" at 1.) Although Zerler could not testify at the evidentiary hearing on account of severe and current health issues, Rogers, a licensed civil engineer who served as a United States Navy Salvage Officer and has worked with Zerler since 1989, did testify. (*See* RMST Evid. Hr'g Ex. 52; 2009 Update at 4.) Rogers testified that items assessed by Zerler typically sell within ten to twelve percent of their appraised value, with the *Atocha* artifacts selling within eight percent of Zerler's appraisal.[18] Moreover, the Zerler–Rogers appraisal was independently reviewed by Alasko, who vouched for its accuracy.

Taking into account the entire record before the court, the court **FINDS** $110,859,200 to be an appropriate approximation of the fair market value of the artifacts. That figure is representative of the invaluable service that RMST has provided in its salvage of the Titanic.

2. **The Labor Expended by the Salvors in Rendering the Salvage Service (*Blackwall* Factor 1)**

 The amount of time, money, and energy that RMST has expended since

---

17. The money, time, and labor expended in salvaging the Titanic, and in preserving and displaying its artifacts, will be considered in relation to the other *Blackwall* factors. *See infra* Part II.B.2. through 7.

18. The shipwreck believed to be *Nuestra Señora de Atocha* ("*Atocha*") was the subject of *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978).

1993 represents an enormous investment for the salvors. Over the course of six expeditions to the wreck site, RMST has spent over 180 days at sea, logged more than 100 dives, and spent a combined total in submersible operations in excess of 1000 hours. (Geller Decl. ¶¶ 3, 10 (Nov. 29, 2007) (hereinafter "Geller Decl.").) In expedition costs alone, RMST has spent $9,049,000. (*See* RMST Evid. Hr'g Ex. 67.)[19] When considered in conjunction with its efforts conserving and exhibiting the artifacts, RMST has devoted well over 500,000 hours of labor to the salvage of the Titanic. (Geller Decl. ¶ 17.)

The vast majority of salvage operations in search of sunken property last a matter of hours or days, with only a few known cases to have lasted longer than a month. *See Columbus–America II*, 56 F.3d at 571 ("Our research has revealed only two other sunken property cases in which it was reported that the salvor's operations lasted longer than a month." (footnote omitted)). Although the time spent on a project is no sure indication of its success, the court recognizes the sheer magnitude of the resources that have been devoted to the salvage of the Titanic. In determining the amount of an appropriate salvage award, the labor expended by RMST weighs greatly in its favor.

### 3. The Promptitude, Skill, and Energy Displayed in Rendering the Service and Saving the Property (*Blackwall* Factor 2)

█ The Titanic lies two and a half miles below the surface of the North Atlantic. Without question, recovering arti-

facts at such a depth requires state of the art equipment and expertise. As of 2007, there were only five manned submersibles in the world capable of descending to this depth, three of which were employed by RMST. (Dettweiler Decl. ¶ 8 (Nov. 28, 2007) (hereinafter "Dettweiler Decl.").) Because those vessels were designed for purposes of research, not salvage, RMST was required to invent approximately twenty new tools with which to equip the submersibles. (RMST Evid. Hr'g Ex. 3 (Nargeolet Decl. ¶ 6 (Nov. 28, 2007)).) For example, to avoid crushing fragile objects with the manipulator arm of the submersible, RMST developed a vacuum system for the collection of small artifacts. (*Id.*) Indeed, such inventions were often artifact-specific, such as the long, flat shovel, designed to recover a stained glass window. (*Id.*)

By far the most impressive innovation, however, was the system used to raise the Big Piece of the hull. For that task, RMST positioned lift bags, full of diesel fuel, around the Big Piece, and when weights were released, the diesel fuel, being less-dense than water, hoisted the Big Piece towards the surface. (*Id.* ¶ 5.) The difficulty arose in controlling the ascent of the lift bags, and the first attempt to raise the Big Piece, in 1996, was a failure. (Dettweiler Decl. ¶¶ 14, 15.) The Big Piece was successfully recovered in 1998, and, as it weighed over fifteen tons, it was the largest artifact ever to be recovered from the deep ocean. (*Id.*)

In addition to RMST's successes, however, the court is equally cognizant as to

---

**19.** RMST's Exhibit 67 purports to correct Exhibit 6 to the Declaration of Kelli Kellar, reducing the costs of the 2000 expedition from $2,710,000 to $2,107,000. After making such adjustment, Exhibit 67 indicates the total expedition costs to be $9,047,000. Upon the court's review, however, the total costs from all expeditions adds up to $9,049,000, as opposed to $9,047,000, as reflected in Exhibit

67. Notably, these expedition costs exclude the $1,845,000 in expenses associated with The Discovery Channel in fiscal year 1999, as those expenses were directly responsible for generating $3,495,000 in revenue during that same fiscal year. (*See* Kellar Decl. ¶ 7 and Ex. 6 (Nov. 29, 2007) (hereinafter "Kellar Decl."); *infra* note 32.)

some of its failures. Kenneth Vrana ("Vrana"), President and Chairman of the Center for Maritime and Underwater Resource Management ("CMURM"), submitted a report to the court on the 2004 expedition, in which he estimated that the damage rate to recovered artifacts was around twenty-one percent (i.e., thirteen out of sixty-three artifacts). (RMST Evid. Hr'g Ex. 64 at 3.) Moreover, due to technical difficulties in operating the ROVs, RMST failed to recover thirteen artifacts, despite serious attempts at their recovery. (*Id.* at 2.) Lastly, eight out of the ten ROV dives were terminated due to equipment failure, with three dives being terminated before reaching the ocean floor. (*Id.* at 1.)[20]

While the court is obviously displeased to learn that some artifacts have been damaged due to ROV operations, that fact also emphasizes the fragility of the artifacts that RMST has recovered. Indeed, the salvage operations are far from complete when the artifacts emerge from the ocean. Each artifact undergoes an extensive cataloguing and conservation process that is dictated by the composition of the artifact, whether it be metal, ceramic, paper, or textile. (Savatsky Decl. ¶ 10 (Nov. 29, 2007) (hereinafter "Savatsky Decl.").) Although most conservation efforts, aside from desalination, are carried out by contract conservators (*see* RMST Evid. Hr'g Ex. 68 at 4), this action bespeaks the level of care and expertise required, as well as RMST's commitment to preserving the condition of the artifacts.[21]

Considering the immense level of difficulty in retrieving and caring for the Titanic artifacts, the court finds that RMST has shown a high level of skill in its salvage operations.

### 4. The Value of the Property Employed by the Salvors in Rendering the Service, and the Danger to which such Property was Exposed (*Blackwall* Factor 3)

As previously mentioned, as of 2007, there were only five manned submersibles in the world capable of descending to the depth of the Titanic wreck site, 12,500 feet below the ocean surface.[22] For that reason, RMST entered into a series of charters over the course of its six expeditions to obtain access to manned submersibles, ROVs, and surface support ships. (*See* RMST Evid. Hr'g Ex. 3 at Ex. 1 ("Schedule of Vessels and Major Equipment Used in Titanic Salvage Operations").) The most frequently used vessels include the Nadir, a surface support ship, and the Nautile, a manned submersible, which RMST chartered from IFREMER for the 1993, 1994, 1996, and 1998 expeditions. At the time of these expeditions, the Nadir had an estimated value of $10,000,000, whereas the Nautile was worth approximately $44,000,000. (*Id.*) The court accepts these figures as representative of the highly specialized equipment necessary to perform the salvage of the Titanic wreck site.

As RMST did not own this equipment, however, the court views this factor to be less important than the others.[23] This fac-

---

**20.** On the 2010 expedition to the wreck site, RMST, for the first time, will supplement its use of ROVs with the use of autonomous underwater vehicles ("AUVs"), which are self-sufficient, non-tethered robotic vehicles that can remain underwater for days at a time. (Periodic Report at 3 (Aug. 10, 2010).) For more information on the 2010 expedition, see *infra* note 27.

**21.** For further discussion of RMST's conservation efforts, see *infra* Part II.B.7.

**22.** *See supra* Part II.B.3. at 26.

**23.** The risk to which this property was exposed is discussed further under the next factor. *See infra* Part II.B.5. The cost to RMST of renting this equipment is subsumed within

tor's relevance exists solely in exemplifying the technological demands of salvaging the Titanic wreck site, and to that extent, the factor weighs in RMST's favor.

## 5. The Risk Incurred by the Salvors in Securing the Property from the Impending Peril (*Blackwall* Factor 4)

In order to induce salvors to come to the aid of distressed persons and property, salvage law must reward those who risk their own safety and property when assisting the distressed vessel. *See The Blackwall*, 77 U.S. (10 Wall) at 14. As discussed under the previous factor, however, RMST did not actually own the vessels it used in salvaging the Titanic. Moreover, under the 1993, 1994, and 1996 charters, IFREMER explicitly assumed the risk of loss to property and liability for personal injury arising out of the operation of the leased vessels, with the exception of injury to persons specifically invited on board by RMST (e.g., journalists and media). (*See* RMST Evid. Hr'g Exs. 4, 5, and 6 at ¶ 24.2.) [24] In 2000, the Shirshov Institute also assumed the risk of loss to its equipment, unless due to the direct negligence of RMST, as well as the risk of injury or death to its employees, unless caused by RMST's acts, omissions, or negligence. (*See* Geller Decl. Ex. 3 at ¶¶ 2.6, 13.1.) Lastly, in 2004, both Phoenix International, the owner of the ROV employed, and Secunda Marine, the owner of the surface ship, assumed the risk of loss to their vessels and the risk of personal injury to their employees, even if caused by RMST's negligence. (*See* Geller Decl. Ex. 2 at ¶ 6(c),(d), and Ex. 1 at Part II.12(a).) Taking these provisions together, the courts finds it improper, in conducting the *Blackwall* analysis, to reward RMST for any risk that it expressly contracted away.

Nevertheless, the court is cognizant of the risks that RMST did face, not the least of which is the possibility of death or serious bodily injury faced by those RMST personnel participating in expeditions. In *Columbus–America II*, the Fourth Circuit noted that the vessel's 160–mile distance from shore "meant that treatment for the most severe injuries was hours away." 56 F.3d at 572. By comparison, the Titanic wreck site lies approximately 400 nautical miles offshore, in an area of the North Atlantic in which the only "open weather window" occurs in the summer, in the midst of hurricane season. (Geller Decl. ¶ 11.) Indeed, salvage operations were suspended on several occasions due to approaching hurricanes and storms. (*Id.*)

The dangers on the surface, however, pale in comparison to the dangers faced by the passengers of the manned submersibles diving to the ocean floor. The water pressure at that depth is 6,300 pounds per square inch, meaning that a breach in, or even significant damage to, the hull of the submersible would cause the instantaneous death of the entire crew. (Dettweiler Decl. ¶ 11.) Moreover, it takes approximately three hours to travel to the wreck site and four hours to return, with approximately eleven hours spent on the bottom. (RMST Evid. Hr'g Ex. 9 (Sinclair Dep. at 18:1–11 (Oct. 9, 2009)).) With temperatures inside the submersible dipping below 50 degrees Fahrenheit, and tight quarters requiring crew members to remain flat on their stomachs during the dives (Dettweiler Decl. ¶¶ 12, 13), crew members faced not only the risk of death, but also continuous hours of physical discomfort.

Although RMST was not contractually liable for all of the risks involved with salvaging the Titanic, particularly the risk

---

the expedition costs discussed under *Blackwall* factor 1. *See supra* Part II.B.2.

**24.** The 1998 charter with IFREMER contains no risk of loss provision. (*See* RMST Evid. Hr'g Ex. 7.)

of loss to the vessels, employees of RMST were amongst those that took their lives in their hands to descend to the wreck site in order to collect the artifacts that are the subject of this proceeding. It is that type of risk-taking that the salvage award is meant to compensate, in order to encourage and induce such efforts in the future, and the court recognizes the high level of risk faced by those individuals with RMST.

### 6. The Degree of Danger from which the Property was Rescued (*Blackwall* Factor 6)

■ In *Columbus–America II*, the Fourth Circuit evaluated the danger from which the salvaged gold was rescued as follows:

> While it is true that the ocean itself presents no danger to the essential nature of gold and similar substances, it is also true that any value that our society attributes to gold depends entirely on the ability of someone to assert a property interest in it. Because property is far less certain of being recovered once it has sunk, especially when it has sunk in deep water, we perceive that its sinking sharply increases the degree of danger to its continued existence and utility as property. We have little doubt that, if the BLACKWALL Court were transported over 125 years into the future to decide this case, it would consider Columbus–America's salvage of the CENTRAL AMERICA to be the ultimate rescue from the ultimate peril.

56 F.3d at 573. Similarly, the Titanic artifacts were previously lost on the bottom of the ocean, depriving the public of all social utility in their historic symbolism and cultural beauty. Instead, RMST has recovered those items from a fate of being lost to future generations. As in *Columbus–America II*, such a rescue can be considered "the ultimate rescue from the ultimate peril," *Id.*

Moreover, the wreck of the Titanic itself is in a process of bio-deterioration that, in one projection, may lead to the deterioration of the promenade decks by the year 2030, with the decking at all levels continuing to collapse towards the keel as the walls fail. (RMST Evid. Hr'g Ex. 20 at 94–95.)[25] Although the court need not make a precise determination as to the exact rate of bio-deterioration of the Titanic wreck site, the court does properly acknowledge the serious danger from which these artifacts have been recovered as being another factor supporting a liberal salvage award.

### 7. The Degree to which the Salvors have Worked to Protect the Historical and Archeological Value of the Wreck and the Items Salved (*Columbus–America I* Factor)

In its role as salvor-in-possession, RMST has been charged by this court with the care and preservation of the artifacts pending the outcome of this proceeding. Indeed, RMST has been in possession of some of the artifacts before the court for almost seventeen years. In that time, RMST has been dedicated not only to preserving the condition of the artifacts, but also to exhibiting them to the public in a series of exhibitions around the world.

■ From the moment artifacts are pulled from the water, RMST is working to stabilize their condition to prevent deterioration. The process required depends

---

**25.** This projection is taken from the draft report of D. Roy Cullimore, Ph.D., Registered Microbiologist, and Lori Johnston, M.Sc, Deep Ocean Biologist, entitled: "Bio–Deterioration of the *RMS Titanic, 2003* and *2004*—An Evaluation of the Role of Rusticles in the Removal of Iron from the Steel of the Ship." (RMST Evid. Hr'g Ex. 20.) In a letter dated November 6, 2009, the authors gave the court permission to make the report an exhibit in its draft form.

on the type of artifact. Ferrous metals, for example, are at risk of oxidation upon being removed from the low-light, low-oxygen environment of the wreck site, and, therefore, such items are immediately placed back in water for transport to RMST's warehouse in Atlanta. (Savatsky Decl. ¶ 10.) Textiles and paper, on the other hand, which are extremely delicate from the exposure to salt water, are freeze-dried or frozen upon recovery. (*Id.*) Once transported to the lab, textiles and paper, like other objects, are subjected to a desalination process, a process which can take from six months to two years, depending on the type of object. (*Id.*) Ceramics take the least amount of time to desalinate, although it can take longer if the piece is broken. (*Id.*)

Other than desalination, RMST contracts with professional conservators to perform the vast majority of the stabilization efforts. (*See* RMST Evid. Hr'g Ex. 68 at 4; Ex. 33.) RMST tracks the condition of its artifacts through condition reports (*see, e.g.,* RMST Evid. Hr'g Ex. 40), and RMST's 10,080 square foot facility in Atlanta is specifically designed and maintained for the artifacts' preservation.[26] For example, the warehouse is equipped with a climate-controlled "bubble" to house metal, glass, and ceramic artifacts at ap-proximately thirty-five to forty percent humidity. (Savatsky Decl. ¶¶ 5, 6.)

RMST has created an extensive database for every artifact that it has recovered from the wreck site, which tracks information such as the object's exhibition and conservation history. (*See, e.g.,* RMST Evid. Hr'g Ex. 38.) The amount of information contained in the RMST database is impressive; the examples submitted to the court are themselves voluminous. Such efforts are critical to preserving the historical value of the artifact collection. In that regard, RMST has devoted substantial resources to the *in situ* study of the Titanic wreck site, gathering data and images to create a map of the debris field, in hopes that such information will provide greater insight into the interrelationship between and among the artifacts. For example, much can be learned from this data about how the vessel sank. (Vrana Decl. ¶ 6 (Nov. 29, 2007).) [27]

RMST has further promoted the historical significance of the Titanic through the worldwide exhibition of the recovered artifacts. RMST has displayed the artifacts on four continents to nearly twenty million people. (*See* Geller Decl. ¶ 17; RMST's Post–Hr'g Mem. Supp. Mot. for Salvage Award at 30 (Dec. 21, 2009).) RMST has approximately five exhibitions running at

---

**26.** Approximately 400 to 500 square feet is dedicated to other exhibitions run by Premier Exhibitions, Inc., RMST's parent company.

**27.** For the first time, artifact recovery will not be an objective of the 2010 expedition. (Periodic Report at 4 (Aug. 10, 2010).) Rather, the primary objective will be charting the position of the ship and the artifacts on the ocean floor in order to develop a comprehensive baseline map of the site. (*Id.* at 2.) Although the expedition will be sponsored and funded almost entirely by RMST, the project is undertaken in association with The Woods Hole Oceanographic Institution, The Institute of Nautical Archaeology, The National Oceanic Atmospheric Administration's Office of National Marine Sanctuaries, The National Park Service's Submerged Resources Center, and the Waitt Institute. (*Id.*) In addition to mapping the site, RMST plans to conduct biodeterioration research on the wreck itself, which may include the collection of "rusticles," as authorized by the court on April 30, 2010. *See supra* note 6. In sum, the 2010 expedition represents a collaborative effort towards the long-term preservation of the Titanic wreck site, and the court looks favorably upon RMST's continued efforts as salvor-in-possession when evaluating the present salvage award.

any given time, with about thirty percent of the artifacts on display. (Savatsky Decl. ¶ 4.) RMST has developed various educational programs to accompany its exhibits, including an impressive teaching guide for various school grade-levels and a special program for senior citizens. (*See* RMST Evid. Hr'g Exs. 58, 60.)

Moreover, when the artifacts are on tour, RMST takes great lengths to ensure their preservation. RMST installs all exhibitions itself, as compared with most museums, which allow host venues to install the exhibitions themselves. (Savatsky Decl. ¶¶ 17, 18.) RMST sends with the artifacts a "Security and Log Notebook," providing the venue with information regarding the proper environment and treatment of the artifacts, as well as requiring the constant monitoring of such factors as temperature and humidity. (*See, e.g.,* RMST Evid. Hr'g Ex. 32.) After artifacts are placed on tour, if necessary, they are then returned to the warehouse for a period of "resting" to prevent deterioration. (Savatsky Decl. ¶ 16.)

As RMST has requested an *in specie* award granting it title to the artifacts, it comes as no surprise to the court that RMST has invested significant time, energy, and resources in the care and preservation of the artifacts. Such efforts are not properly perceived as a sacrifice for the public interest, but rather as RMST making what it thinks to be a good investment in its business. Similarly, the display of the artifacts is a profitable venture, whether or not it also shares the story of the Titanic with the world. Nonetheless, the issue before the court is the degree to which the salvors have worked to protect the historical and archeological value of the artifacts, and not their motive for doing so. There is extensive evidence before the court of RMST's efforts at conservation, education, and exhibition, and thus, the court finds RMST's efforts to be deserving of a salvage award that includes recognition of these efforts.

### C. Potential Deductions
### 1. Disqualifying Salvor Misconduct

In seeking a salvage award, a salvor must come to the court with clean hands, acting "in entire good faith and with honesty of purpose." *Columbus–America II,* 56 F.3d at 569 (citation omitted). If a salvor comes to the court with unclean hands, its award may be reduced or entirely forfeited, depending on the level of misconduct. *See Columbus–America I,* 974 F.2d at 468 (citation omitted). Thus, the court must determine whether RMST has engaged in any disqualifying salvor misconduct.

Nevertheless, "it is not entirely clear what constitutes bad faith." *Adams v. Unione Mediterranea Di Sicurta,* 220 F.3d 659, 676 (5th Cir.2000). In *Adams,* a salvor purported to sell its rights in a deposit of sunken steel, although it was later determined that the salvor, in fact, did not have title at the time of the purported sale. *Id.* at 676–77. The district court found, and the Fifth Circuit affirmed, that such action did not constitute "bad faith." *Id.* The court found that, although the salvor "may not have acted entirely in good faith," the salvor had "some basis to believe it could salvage the steel and at least transfer a possessory interest." *Id.* In sum, the salvor and the purchaser of the steel had "acted negligently but their behavior did not rise to bad faith under the law." *Id.*

Over the course of these lengthy proceedings, the court has grown tired of the repeated attempts of RMST to assert title to the artifacts, despite its established position as salvor-in-possession. *See, e.g., Titanic 2007,* 531 F.Supp.2d at 693 n. 4 ("The court will no longer tolerate these maneuvers by RMST to circumvent the court's

final ruling that RMST is the salvor, and *not the owner*, of the artifacts. Further circumvention efforts will be met with appropriate sanctions under Federal Rule of Civil Procedure 11 and a review by this court of RMST's status and privilege to remain as salvor-in-possession of the *R.M.S. Titanic*." (emphasis in original)). Ultimately, the court's concerns stem from RMST's prior attempts to sell the artifacts that have been entrusted in its care.[28] Indeed, those concerns are magnified by the non-adversarial nature of these proceedings.

■■■ Nevertheless, to the court's knowledge, RMST has not actually sold any artifacts.[29] Although the court wonders what would have happened without the court's intervention, *see Titanic 2001*, RMST's *plans* to sell artifacts, to which it lacked title, does not rise to a level of bad faith that would require a substantial reduction in the amount of the salvage award. *See Adams*, 220 F.3d at 676–77 (finding sale of interest in salvaged property, without title to that property, did not amount to bad faith, when salvor had some basis to believe it had a possessory interest in the property). Although RMST may not have acted in the utmost good faith in all of its dealings with this court, the court holds that RMST has not engaged in disqualifying salvor misconduct, so as to forfeit its right to a salvage award or to warrant a substantial reduction in such award.

### 2. Contributions of Co–Salvors

■■■ The total salvage award must include the contributions of all co-salvors.

*Platoro*, 695 F.2d at 904 n. 15. After calculating the total award, the court must then allocate the award among co-salvors "according to each co-salvor's contribution to the recovery." *Id.* at 903. Thus, the court directed RMST to submit evidence as to any uncompensated or undercompensated entities or individuals assisting with the salvage. *Titanic 2004*, 323 F.Supp.2d at 742–44.

■■■ After a careful review of the record, the court is satisfied that there are no co-salvors in this case. Although RMST chartered the equipment necessary to carry out its salvage operations, those charter agreements represent arms-length transactions at market rates. Indeed, the charters themselves contain provisions in which the vessels' owners specifically denounce any ownership interest in the recovered objects. (*See, e.g.*, RMST Evid. Hr'g Exs. 4, 5, and 6 at ¶ 21.1.)[30] The court finds that the vessels' owners were properly compensated for their assistance with salvage operations. (*See, e.g.*, RMST Evid. Hr'g Ex. 63 (listing payments received by IFREMER for the 1994 expedition and indicating no outstanding balance).)

Similarly, there is no indication that the conservators employed by RMST received below-market rates for their services. (*See, e.g.*, RMST Evid. Hr'g Ex. 41 at 16–19 (invoices from Northeast Document Conservation Center).) As no entity or individual has been uncompensated or undercompensated by RMST in relation to its salvage efforts, the court finds that there are no co-salvors that would be entitled to share in the total salvage award with RMST.

---

**28.** *See supra* Part I. at 7.

**29.** The court has allowed RMST to sell some of the recovered coal.

**30.** The only charter that did not contain such a provision was the 1998 charter with IFREMER. (*See* RMST Evid. Hr'g Ex. 7.)

This agreement largely focuses on the equipment required to make a live broadcast from the wreck site, and the court is confident that the parties understood that IFREMER was not a co-salvor, based upon their previous dealings in the 1993, 1994, and 1996 expeditions, and IFREMER has made no such claim to the court.

### 3. Revenues from Possession of the Artifacts

This court has previously held that RMST's salvage award must be reduced by any amount previously received by virtue of its possession of the artifacts. The court explained:

> Finally, because a salvage award is a reward for performing salvage service, see *The Blackwall*, 77 U.S. (10 Wall.) at 14, rather than payment for the property recovered by the salvor, to the extent that a salvor has already been monetarily rewarded by virtue of its possession of salvaged artifacts, its salvage award should be accordingly reduced. In this regard, RMST's salvage of the Titanic wreck presents a novel circumstance. In no other case known to the court, in which a salvage award was calculated following an evidentiary hearing, has the property saved had significant pre-salvage award exhibition value that has been a major source of income for the salvor-in-possession. The salvor should not receive additional reward for his services simply because the court chose not to sell the saved property immediately after it came within the court's jurisdiction. *Cf. The Blackwall*, 77 U.S. (10 Wall.) at 15 (holding that one salvor does not benefit from the fact that another salvor chooses not to seek an award in the *in rem* proceeding). Thus, principles of equity dictate that the salvage award should be reduced by any amount of payment already received on account of the performance of the salvage service, in particular, the monetary benefits of the exhibitions of the recovered artifacts.

*Titanic 2004*, 323 F.Supp.2d at 743.

At the court's direction, RMST submitted evidence as to its revenues and expenses through the fiscal year ending on February 28, 2007. Two major problems existed, however, in calculating RMST's revenue and expenses from the audited financial statements submitted to the Securities and Exchange Commission ("SEC") by Premier Exhibitions, Inc. ("Premier"), RMST's parent company. (Kellar Decl. ¶ 3.) First, Premier's overall figures included revenue and expenses from the 1987 artifacts, which are not currently before the court.[31] Thus, RMST needed to isolate the revenue and expenses attributable to the 1993–2004 artifacts. Second, Premier's overall figures included revenue and expenses, in fiscal years 2005–2007, from Premier's other operations, primarily its "Bodies" exhibit that involves the display of human cadavers. Therefore, RMST also needed to separate out those revenues and expenses that were wholly unrelated to the Titanic artifacts before this court for the present salvage award.

In order to arrive at estimates of RMST's revenue and expenses attributable only to those artifacts before the court, RMST went through a series of assumptions and calculations involving Premier's filings with the SEC. As a preliminary matter, RMST excluded all revenue and expenses associated with non-Titanic operations, including the "Bodies" exhibit. (*See id.* ¶ 9 and Ex. 2.) Moreover, RMST removed gains and losses from the sale/disposal of assets not directly related to the Titanic. (*Id.* Ex. 1.) RMST also removed the revenue and expenses associated with Titanic merchandise, as these amounts did not apply to the artifacts. (*Id.*) RMST then removed all tax amounts and applied a statutory rate of forty percent. (*Id.*)

Additionally, RMST opted to extract the expedition costs from the overall expenses, so that these costs could be considered

---

**31.** *See supra* notes 4 and 7 and accompanying text.

separately. This was done in order to standardize the data, in light of a change in accounting practices that was ordered by the SEC in 2002. (*Id.* ¶ 7 and Ex. 6.)[32] The expedition costs summed to a total of $9,049,000.[33]

Finally, RMST attempted to exclude those revenues and expenses related to the 1987 artifacts. In order to accomplish that goal, RMST excluded approximately $7,700,000 in losses during 1993–1995, on the assumption that the "bulk of this activity was attributable to the 1987 artifacts." (*Id.* ¶ 6.) Such exclusion was intended to be a conservative assumption, with the effect of artificially increasing the apparent amount of net income attributable to the 1993–2004 artifacts. (*Id.*) For the remaining years, RMST assumed that the revenues and expenses attributable to the 1987 artifacts were forty-two percent of the total figures, on the grounds that each exhibit is comprised of approximately forty-two percent of 1987 artifacts and fifty-eight percent of 1993–2004 artifacts. (*Id.* ¶ 11.) Such apportionment was applied generally to all revenues and expenses in the relevant period (*see id.* Ex. 4), with the exception of conservation costs prior to 1998, which were excluded in their entirety because of unclear corporate records. (*Id.* ¶ 12 and Ex. 5.) That exclusion, again, artificially increased the revenue attributable to the 1993–1994 artifacts.

Based upon the forgoing assumptions and calculations, RMST generated $1,937,305 during the fiscal years 1996–2007 from the 1993–2004 artifacts. (*Id.* Ex. 4.) Subtracting the $9,049,000 in expe-

dition costs from those revenues, RMST suffered a net loss during fiscal years 1996–2007 of $7,111,695.[34]

The court recognizes the inherent difficulty in isolating the revenue and expenses generated by the artifacts before the court from the revenues and expenses generated by the 1987 artifacts. Although the approach taken by RMST undoubtedly oversimplifies the process, the court finds the approach to be a reasonable approximation of the revenue generated by the 1993–2004 artifacts before 2007, especially in light of RMST's exclusion of roughly $7,700,000 in losses between 1993–1995. The court's main concern is with RMST's subtraction of its expedition costs from those exhibition revenues.

RMST argues that the court must consider the expedition costs in association with the exhibition revenues, as those exhibition revenues were only made possible by the costs RMST expended in retrieving the artifacts. (*See* RMST's Mem. Supp. Mot. for Salvage Award at 37–38 (Nov. 30, 2007).) While the court understands such an argument, it also finds it to be inconsistent with RMST's request for prejudgment interest. (*See* Motion ¶ 15.)

▮▮▮ In maritime cases, "the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *U.S. Fire Ins. Co. v. Allied Towing Corp.,* 966 F.2d 820, 828 (4th Cir.1992) (citations omitted). Typically, prejudgment interest serves "as compensation for the use of funds to which the claimant was rightfully entitled." *Nori-*

---

32. An exception to this is the portion of the expedition costs in fiscal year 1999 associated with the direct generation of revenue from The Discovery Channel. As those $1,845,000 in expenses were directly responsible for the $3,495,000 in revenue received from The Discovery Channel, those costs were left in the overall income analysis. (Kellar Decl. ¶ 7 and Ex. 6.)

33. *See supra* note 19 and accompanying text.

34. This figure represents a correction to the original Exhibit 7 to the declaration of Kelli Kellar, as well as to the purported correction provided in RMST's Exhibit 67. *See supra* note 19 and accompanying text.

*take Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 728 (5th Cir.1980). In this case, however, RMST's expenses in obtaining the artifacts led to accruing exhibition revenues; in other words, RMST was not truly deprived of the use of its funds, as it received a return on its initial investment. Thus, the court does not find it appropriate to award prejudgment interest, if RMST has already been compensated, in some form, for the use of its funds.

Thus, the court originally proposed to place RMST in the position of a typical salvor by deducting its operational profits. Under normal circumstances, a salvor would expend money and labor in assisting a distressed vessel, after which the salvor would receive a salvage award, with interest for the delay in the salvor's recompense. By subtracting from the salvage award the money RMST had received from possessing the artifacts, the court intended to place RMST in that position of the typical salvor, as one who expended time and resources in conducting salvage operations, and who would then be entitled to a salvage award, along with prejudgment interest. The court does not understand, however, how RMST would be entitled to both its operational profits and prejudgment interest.

 In sum, the court will accept RMST's position that it has failed to accumulate any profits from possession of the artifacts, in light of the costs incurred in salvaging the artifacts. Therefore, the court will decline to make a deduction from the salvage award for revenues earned via possession of the artifacts. Nevertheless, consistent with that position, the court also declines to award prejudgment interest, finding this to be a particularly unusual case. *See U.S. Fire Ins.,* 966 F.2d at 828 ("A district court, however, may decline to award prejudgment interest when 'peculiar circumstances' would render such an award inequitable." (citation omitted)).

RMST has been compensated for its investment via its operational revenues for the period 1996–2004, and therefore, the court finds a further award of prejudgment interest would not be equitable in this case.

### 4. Summary of Potential Deductions

Based on the foregoing, the court finds no deductions to be attributable to salvor misconduct, contributions of co-salvors, or revenues from possession of the artifacts, but declines an award of prejudgment interest. As such, the court will determine the amount of the award solely based upon the principles of salvage law represented by the *Blackwall/Columbus–America I* factors, as discussed above.

### D. Amount of the Award

 In determining the amount of a salvage award, the court may either fix a sum certain, or the court may award the salvor a percentage of the market value of the property. *See, e.g., Columbus–America II,* 56 F.3d at 573 (affirming salvage award of ninety percent the fair market value of the salved property); *see also Margate Shipping Co. v. M/V Orgeron,* 143 F.3d 976, 989 (5th Cir.1998) ("[O]ur analysis of the economic foundations of the *Blackwall* rule indicates that the value of the salved property is one of the most important of the factors. The most natural way to effectuate its salient character is simply to make the award a function of that value." (citations omitted)).

Michael Anderson ("Anderson"), an expert in marine salvage operations and salvage compensation, testified regarding his opinion as to the appropriate level of the award. A previous expert in the *Columbus–America* case, Anderson has experience, *inter alia,* in negotiating salvage contracts on behalf of the governments of various nations, as well as insurance com-

panies worldwide. (RMST Evid. Hr'g Ex. 24 at 4.) Anderson testified at the evidentiary hearing in October 2009, that, in order to properly induce salvage operations similar to those undertaken by RMST, an award of *at least* ninety-five percent of the fair market value of the artifacts would be appropriate. Anderson based his opinion on the difficulty of the salvage operations, including such factors as the depth of the wreck site, the distance off-shore, the condition of the wreck site, and the fragility of the artifacts.[35]

As discussed at great lengths above, the court agrees that the salvage of the Titanic has involved unprecedented feats of skill and dedication, both in the salvage of the artifacts and their conservation and exhibition. Weighing the *Blackwall/Columbus–America I* factors, in particular the labor and resources expended and the skill involved, the court finds that RMST is entitled to a salvage award of **ONE HUNDRED PERCENT** (100%) the fair market value of the artifacts recovered in the 1993, 1994, 1996, 1998, 2000, and 2004 expeditions to the *R.M.S. Titanic*.[36]

### E. Payment of the Award

■ The court has yet to decide the manner by which to pay the salvage award. Although RMST has sought an *in specie* award, the decision whether to grant an *in specie* award lies solely within the court's discretion. *Titanic 2002*, 286

F.3d at 204 ("If it becomes apparent to the court that the proceeds of any sale would clearly be inadequate to pay the salvor its full reward, then the court *might*, as a *matter of discretion*, award the salvor title to the property in lieu of the proceeds of sale, thus saving the costs of sale. The salvor does not have a direct right, however, to title in the property." (emphasis added) (citation omitted)). Although the court has found that an award of the entire fair market value of the artifacts would be appropriate in this case, the court maintains reservations about granting RMST title to the artifacts, for fear that the court would end up in a perpetual legal battle with RMST over the meaning and scope of the covenants and conditions that the United States, through the United States Attorney, has negotiated and finalized with RMST and the court.[37]

Thus, the court reserves its discretion to sell the artifacts in a judicial sale, until which time it may determine that no appropriate buyer for the collection, capable of maintaining and preserving the artifacts for the public interest, has interest in purchasing the collection at a fair market price. The court will make such determination no later than August 15, 2011. Until that time, RMST may maintain possession of the artifacts pending a final decision in this case.[38]

---

35. In particular, Anderson compared the salvage of the Titanic to the operations in the *Columbus–America* case and found the Titanic operations of a higher degree of merit.

36. Given the amount of the award, the court need not consider whether RMST is independently entitled to reimbursement and expenses for the retention and use of expert witnesses in this proceeding. (*See* Motion ¶ 16.)

37. *See supra* note 10 and accompanying text; *infra* Exhibit A.

38. The court anticipates that the revenue generated from the exhibition of the artifacts will exceed the costs associated with maintaining them, pending this court's final decision. (*See* Kellar Decl. Ex. 4; *supra* Part II.C.3. at 45.) To the extent that this is not the case, however, given RMST's position that the artifacts only increase in value over time, any costs or expenses associated with the continued possession of the artifacts will be covered through the judicial sale or *in specie* award.

### III. Conclusion

For the reasons set forth in this Opinion, the court hereby **GRANTS** RMST a salvage award in the amount of **ONE HUNDRED PERCENT** (100%) the fair market value of the artifacts recovered in the 1993, 1994, 1996, 1998, 2000, and 2004 expeditions to the wreck of the *R.M.S. Titanic*. The court specifically reserves the right to determine the manner in which to pay the award, which decision will be made no later than August 15, 2011. RMST may maintain possession of the artifacts pending the court's decision.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel of record, and to Lawrence R. Leonard, Assistant United States Attorney.

**IT IS SO ORDERED.**[39]

### *INDEX*

I. Factual and Procedural History ..........................................788

II. Analysis ................................................................793
 A. Entitlement to a Salvage Award..........................................793
 B. Factors to be Considered in Calculating the Salvage Award ..................794
 1. The Value of the Property Saved (*Blackwall* Factor 5) .....................795
 2. The Labor Expended by the Salvors in Rendering the Salvage Service (*Blackwall* Factor 1) ........................................797
 3. The Promptitude, Skill, and Energy Displayed in Rendering the Service and Saving the Property (*Blackwall* Factor 2) .................798
 4. The Value of the Property Employed by the Salvors in Rendering the Service, and the Danger to which such Property was Exposed (*Blackwall* Factor 3) .............................................799
 5. The Risk Incurred by the Salvors in Securing the Property from the Impending Peril (*Blackwall* Factor 4) ...............................800
 6. The Degree of Danger from which the Property was Rescued (*Blackwall* Factor 6) ................................................801
 7. The Degree to which the Salvors have Worked to Protect the Historical and Archeological Value of the Wreck and the Items Salved (*Columbus–America I* Factor) .............................801
 C. Potential Deductions......................................................803
 1. Disqualifying Salvor Misconduct .......................................803
 2. Contributions of Co–Salvors...........................................804
 3. Revenues from Possession of the Artifacts .............................805
 4. Summary of Potential Deductions ......................................807
 D. Amount of the Award .....................................................807
 E. Payment of the Award .....................................................808

III. Conclusion ..............................................................809

**Exhibit A**

**Revised Covenants and Conditions**

COVENANTS AND CONDITIONS FOR THE FUTURE DISPOSITION OF OBJECTS RECOVERED FROM THE *RMS TITANIC* BY RMS TITANIC, INC. PURSUANT TO AN *IN SPECIE* SALVAGE AWARD GRANTED BY THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

I. RECITALS OF PURPOSE

A. WHEREFORE, These covenants are entered into by R.M.S. Titanic, Inc.,

**39.** An Index of this Opinion is attached for reference purposes and made a part hereof.

d/b/a/ Premier Exhibitions, Inc. (hereinafter "RMST") as a condition precedent for receiving an *in specie* salvage award from the U.S. District Court for the Eastern District of Virginia ("the Court") in relation to RMST's Motion for an Interim Salvage Award (dated November 30, 2007) in the case styled *R.M.S. TITANIC, INC., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902) ("the pending admiralty action");

B. WHEREFORE, RMST has, by order of the Court (since June 1994) served as salvor-in-possession of The RMS TITANIC wreck site, and (since 1993) as substitute custodian of the artifacts recovered therefrom;

C. WHEREFORE, RMST has conducted six dive expeditions to The TITANIC wreck site, logging 360 day-equivalents on the site, and has devoted thousands of hours to the recovery, stabilization, conservation, curation and exhibition of artifacts salvaged from The TITANIC;

D. WHEREFORE, These Covenants and Conditions shall apply to the present and future disposition, care, conservation, and management of the Subject TITANIC Artifact Collection;

E. WHEREFORE, It is the intent to grant RMST an *in specie* salvage award in the form of title to the artifacts that RMST has recovered and which are within the Court's jurisdiction in the pending admiralty action, such *in specie* salvage award shall be a trust for the benefit of and subject to the beneficial interest of the public in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, and the Covenants and Conditions herein expressed;

F. WHEREFORE, These Covenants and Conditions shall be perpetual in duration, and are intended to govern the disposition, care, conservation, and management of the Subject TITANIC Artifact Collection within the scope of its terms, forever, and irrespective of whether such artifacts continue to be possessed by RMST, and shall be applied to all subsequent owners or possessors of TITANIC artifacts within the scope of its terms; {Court 4/15/2008 Order, at 5}

G. WHEREFORE, These Covenants and Conditions are intended to ensure that TITANIC artifacts within the scope of its terms are, for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. {International Agreement pmbl. ¶ 7; Court 4/15/2008 Order, at 3 & 4}

II. DEFINITIONS OF OPERATIVE TERMS

For the purposes of these Covenants and Conditions:

A. "RMS TITANIC" means the shipwrecked vessel Royal Mail Ship *Titanic*, sunk in the North Atlantic on April 15, 1912, and includes the wreck site and debris field of the shipwrecked vessel. {Titanic Memorial Act 3(c); NOAA Guidelines Scope (f); International Agreement art. 1(a)}

B. "TITANIC Artifacts" means the cargo, tackle, appurtenances and hull of RMS TITANIC, and other contents, including those associated objects (or portions thereof) that are scattered in its vicinity on the ocean floor within the wreck site and debris field, and all such property

recovered from the wreck site since September 1, 1985, and any human remains of those aboard the vessel who perished. {NOAA Guidelines Scope (a); International Agreement art. 1(b); Proposed Legislation § 3(d)-sub(e)}

C. "RMST" means R.M.S. Titanic, Inc., d/b/a/ Premier Exhibitions, Inc., its heirs, successors, and assigns, in exercise of its rights and obligations under these Covenants and Conditions. {Proposed Legislation § 17(h)}

D. "The Court" means the U.S. District Court for the Eastern District of Virginia exercising its jurisdiction in the case styled *R.M.S. TITANIC, INC., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (I) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902).

E. "The Pending Admiralty Action" means the case styled *R.M.S. Titanic, Inc., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902).

F. "The French TITANIC Artifact Collection" means the entirety of artifacts that were recovered by RMST's predecessor entity in the 1987 dive expedition on The TITANIC, and which were the subject of an *in specie* salvage award granted in favor of RMST's predecessor entity in a Procès–Verbal issued October 20, 1993, by the French Maritime Tribunal, exercising

appropriate jurisdiction over those artifacts. {Proposed Legislation §§ 3(c)-sub (a)(3) & 6(d)}

G. "The Subject TITANIC Artifact Collection" means all objects recovered from the RMS TITANIC wreck site and debris field by RMST that are within the jurisdiction of the Court, namely all those objects and artifacts recovered by RMST during the course of its dive expeditions (conducted in 1993, 1994, 1996, 1998, 2000 and 2004) on the site after the initiation of the pending admiralty action in 1992. For the purposes of this operative definition, the Subject TITANIC Artifact Collection does not include (1) lumps of coal recovered from The RMS TITANIC wreck site; (2) extraneous objects removed from the site that, according to the best scientific and historic evidence, were not associated with the RMS TITANIC at the time of its sinking; or (3) objects that are determined to be human remains. {NOAA Guidelines Comment (17); Proposed Legislation § 3(c)-sub (a) & 6(d)}

H. "The TITANIC Collections" refers to the total assemblage of the French TITANIC Artifact Collection and the Subject TITANIC Artifact Collection. {Court 4/15/2008 Order, at 4–5; U.S. Amicus Br. 11 & n. 7}

I. "Qualified Institution" means any entity (whether governmental, not-for-profit, corporate, or otherwise in form or character) that has demonstrated the willingness and capacity (by virtue of facilities, financial resources, personnel, accreditation and/or otherwise) to conserve, curate, manage, and generally care for the Subject TITANIC Artifact Collection, and to ensure that such is available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. Considerations for any evaluation of whether an entity is a qualified institution are included as Annex

A to these Covenants and Conditions. For the purposes of entering into these Covenants and Conditions, RMST is, as of the effective date of these Covenants and Conditions, a qualified institution. {NOAA Guidelines Scope (g); 36 C.F.R. § 79.9}

J. "The Trustee" means any qualified institution which shall have the responsibility and authority to conserve, curate, manage, and generally care for the TITANIC Collections for the public interest. For the purposes of the Covenants and Conditions, RMST shall be the first Trustee of the Subject TITANIC Artifact Collection.

K. "National Oceanic and Atmospheric Administration (NOAA)" refers to the federal agency that represents the public interest in TITANIC Collections and exercises oversight functions in relation to these Covenants and Conditions. NOAA's authority to represent the public interest in this matter is consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's 2001 implementing Guidelines. Such authority shall be carried out consistent with the 1986 Act, other applicable law, and orders of the Court, subject to the availability of resources, appropriations, and other authorized funds. NOAA is not a formal party to these Covenants and Conditions, and does not possess mandatory legal obligations pursuant to the Covenants and Conditions. NOAA shall, however, be an intended beneficiary of these Covenants and Conditions, with the authority to enforce their terms as appropriate on behalf of the public interest. References to NOAA in the context of court proceedings shall, as appropriate, be interpreted to refer to actions by NOAA acting through its counsel the United States Department of Justice.

L. "Conservation" means, in relation to The TITANIC Collections, the handling, cleaning, stabilizing, restoration and conserving of objects in such a manner to preserve them for posterity. {36 C.F.R. § 79.4(b)(6)}

M. "Curation" means managing and preserving The TITANIC Collections for posterity, including, but not limited to: (1) inventorying, accessioning, labeling and cataloging objects; (2) identifying, evaluating and documenting objects; (3) storing and maintaining objects using appropriate methods and containers, and under appropriate environmental conditions and physically secure controls; (4) periodically inspecting objects and taking such actions as may be necessary to preserve them; (5) providing access and facilities for study and research. {Interior Archeology Standards & Guidelines, 48 Fed.Reg. 44737; 36 C.F.R. § 79.4(b)}

N. "Performance guarantee" means the reserve account established under Section V.D. hereof in order to fund an endowment the income of which is sufficient to cover the annual costs to conserve and curate the Subject TITANIC Artifact Collection. It may also include such additional financial undertakings or guarantees as the Court may order under these Covenants and Conditions.

O. "Reserve Account" means that fund set aside by the Trustee and irrevocably pledged for the purpose of providing a performance guarantee for the maintenance and preservation of the TITANIC Artifact Collections for the public interest, as provided by Section V.D. herein;.

III. ENSURING THE UNITY AND INTEGRITY OF THE TITANIC COLLECTIONS {U.S. Amicus Br. 11–12; Court 4/15/2008 Order, at 4–5}

A. The Subject TITANIC Artifact Collection shall be kept together and intact forever, pursuant to the terms of these

Covenants and Conditions. Individual objects or artifacts, or groups of objects or artifacts, as well as all supporting documentation, shall not be dispersed through sale or other disposition (including pledge, collateralization, or similar treatment), except as through a process of deaccessioning, as provided under these Covenants and Conditions. The Subject TITANIC Artifact Collection shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the French TITANIC Artifact Collection as an integral whole by the Trustee. {NOAA Comment (5) & Guideline 28; & International Agreement art. 3}

B. The TITANIC Collections shall be available to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. {International Agreement pmbl. ¶ 7 & Rule 28}

*1. Public Display and Exhibition.* Popular presentation and public display and exhibition of the TITANIC Collections may, at the Trustee's discretion, be at a fixed venue or location, or through one or more traveling exhibitions, and such displays or exhibitions may be permanent, continuous, intermittent, or occasional in character. Public display and exhibition of the TITANIC Collections may include temporary loans of objects to qualified institutions under terms no less exacting than those contained in these Covenants and Conditions. {NOAA Guideline 31; International Agreement Rule 31; 36 C.F.R. § 79.10(e)}

2. Historical Review, Scientific and Scholarly Research.

a. *Research in the Ordinary Course.* Individual objects or artifacts, or groups of objects or artifacts, within the TITANIC Collections shall be made available by the Trustee, in its discretion and consistent with professional standards, to qualified scholars, researchers, and scientists for viewing and study on appropriate terms and conditions, depending on the character of the object being studied, and the nature of the study being conducted, and consistent with best collections management practices. The Trustee may condition access to objects within the TITANIC Collections to reasonable restrictions, in order to ensure fair access, conservation of the Trustee's resources, and preservation of its rights of exhibition and media in such objects (including any relevant intellectual property rights). The Trustee shall (where appropriate) promote the public dissemination of researches and studies in relation to the TITANIC Collections. {NOAA Guideline 27; International Agreement Rule 27; Interior Archeology Standards & Guidelines, 48 Fed.Reg. 44734 (std.IV); 36 C.F.R. § 79.10(b)}

b. *Destructive or Invasive Research.* The Trustee may, in its discretion based on best scientific and research practices, permit the destructive or invasive testing or analysis of selected objects within the TITANIC Collections by highly qualified investigators, using established protocols or techniques of investigation, who are pursuing studies for which no other alternative means of investigation is possible, provided that all efforts are taken to ensure that objects that are truly of an irreplaceable or historically significant nature will not be harmed. An example of legitimate destructive or invasive research within the contemplation of this provision would be metallurgical and forensic analysis of portions of The TITANIC hull, in order to determine the true

causes of the vessel's sinking. The Trustee may allow access to objects within the TITANIC Collections for destructive or invasive testing or analysis, subject to the payment of a user fee to the Trustee for the conduct of such research, and the Trustee may insist that the results of such destructive or invasive research be made publicly available. Research that involves potential harm or destruction of artifacts may only be conducted under a research plan approved by the Court. {NOAA Guideline 3; International Agreement Rule 3; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44734 (stds. II & IV); 36 C.F.R. § 79.10(d)(5); 36 C.F.R. § 79.9(b)(5)(iii)}

3. *Education.* The Trustee shall make all reasonable and appropriate efforts to develop and promote public educational uses and applications of the TITANIC Collections, including curricular materials and items in a variety of mediums. Without derogating its intellectual property rights in such educational materials, the Trustee shall make such materials available on preferential terms to educational institutions at all appropriate levels of instruction. {NOAA Guideline 31}

C. Deaccessioning of Objects within the Subject TITANIC Artifact Collection (STAC).

1. *General Principle.* Deaccessioning of objects in the Subject TITANIC Artifact Collection (STAC) may occur only under extraordinary circumstances and only after a rigorous process of evaluation by the Trustee, which process has demonstrated that a particular artifact or object, or group of artifacts or objects, within the Subject TITANIC Artifact Collection no longer hold historical, cultural or archaeological signifi-

cance or that such items can no longer be properly conserved or curated, based on then-current best collections management practices. {NOAA Guidelines Comment (6); U.S. Amicus Br. 12 n. 8}

2. *Considerations for Deaccessioning.* Considerations that may be relevant to the Trustee in any rigorous process of evaluation for deaccessioning from the STAC, include: (a) whether an object has sufficient intrinsic or historical value or aesthetic merit as an item for further study, research or exhibition; (b) whether an object is redundant or duplicative and has no value as part of a series; (c) whether the physical condition of the object is so poor as to render stabilization, conservation or restoration impossible; (d) whether the physical condition of the object is so poor that it no longer has value for exhibition, research, study or teaching purposes. Any evaluative report made by the Trustee to deaccession an object must fully document its conclusions based on then-current best collections management practices. {AAMD Practices; ICOM Professional Ethics Code 2.13 & 2.15}

3. *Modalities of Disposition by Deaccessioning.* Once an object within the STAC is deaccessioned it may be disposed of in a variety of ways by the Trustee without violating the principle that *objects or artifacts, within the Sub*ject TITANIC Artifact Collection, shall not be dispersed through sale or other disposition. {NOAA Guidelines Comment (6)}

a. Disposition of a deaccessioned object from the STAC may be accomplished by (i) sale to a designated buyer, or by public auction, or by other means in an appropriate arms-length transaction; (ii) sale, exchange or gift to a museum or educational institution in an appropriate arms-

length transaction; or (iii) destruction (in the case of an object that is too badly damaged or deteriorated to be properly conserved or restored). {ICOM Professional Ethics Code 2.13 & 2.15}

b. Before disposition, an object shall be fully and permanently documented by the Trustee, including analysis and imaging, so that future researchers may consult some record of the object. {ICOM Professional Ethics Code 2.13 & 2.15}

c. Any moneys received from the disposition of a deaccessioned object from the STAC shall be applied solely for the benefit of the TITANIC Collections. {ICOM Professional Ethics Code 2.16}

4. Any decision made concerning the deaccessioning of an object from the STAC, and the modalities of such disposition, shall be made upon the initiative of the Trustee. Such shall be based upon an evaluative analysis prepared by the Trustee and directed to the Court. After the filing of such a request and analysis, NOAA may submit information and/or a report and recommendation to the Court regarding the proposed deaccessioning of an object and the modalities of such disposition. The Trustee may make a timely response to any NOAA submission. No deaccession or disposition of an object from the STAC shall occur or be valid except with the approval of the Court. {U.S. Amicus Br. 12 n. 8}

IV. ENSURING THE PROPER MANAGEMENT OF THE TITANIC COLLECTIONS {U.S. Amicus Br. 12–13; Court 4/15/2008 Order, at 4–5}

A. The TITANIC Collections shall be maintained in accordance with current internationally recognized museum standards and practices for collections management. {Proposed Legislation § 17(i)}

B. Specifically, the TITANIC Collections shall be maintained in accordance with the following rules:

1. Conservation of objects in the TITANIC Collections shall be carried out in accordance with professional standards current at the time the conservation project is to be undertaken. {International Agreement Rule 24; NOAA Guideline 24}

2. Curation of objects in the TITANIC Collections shall be carried out in accordance with professional standards current at the time the curation project is to be undertaken. {International Agreement Rule 30; NOAA Guideline 30}

3. Transport, exhibition, and security of objects in the TITANIC Collections, to the extent that such are not otherwise subsumed within standards for curation, shall be carried out in accordance with best practices current at the time a particular activity is to be undertaken. {International Agreement Rule 23; NOAA Guideline 23}

4. Documentation of objects in the TITANIC Collections shall be carried out in accordance with reasonably prudent archaeological standards current at the time the documentation project is to be undertaken, and shall include, where relevant, the systematic and complete recording of the provenance of objects in the TITANIC Collections in order to preserve historical, cultural and archaeological information, and the preservation of field notes, plans, sections, photographs, and imaging/recording of the objects. {International Agreement Rules 5, 21–22; NOAA Guidelines 5, 21–22; Interior Archeology Standards & Guide-

lines, 48 Fed.Reg. 44735–37; 36 C.F.R. § 79.9(b)(6)}

C. The Trustee shall ensure that all conservation, curation, documentation and related projects for the TITANIC Collections shall be undertaken only under the guidance of, and in the presence of, qualified technical and/professional experts with the knowledge, experience and demonstrated competence appropriate to the projects undertaken, and that all persons associated with a project should be (1) qualified and have demonstrated experience appropriate to their project roles; and (2) fully briefed and understand the work required. {International Agreement Rules 17 & 18; NOAA Guidelines 17 & 18; 36 C.F.R. § 79.4(h); Interior Archeology Standards & Guidelines, 48 Fed.Reg. 44739–40}

D. The Trustee shall take all necessary measures to protect the physical security of the TITANIC Collections and shall insure it against casualty or loss. {36 C.F.R. § 79.9(b)(3)}

V. *OVERSIGHT OF COMPLIANCE WITH THE COVENANTS AND CONDITIONS* {U.S. Amicus Br. 13–14; Court 4/15/2008 Order, at 5}

A. NOAA has the authority to gather information and to submit information and/or make reports and recommendations to the Court regarding the compliance of the Trustee with these Covenants and Conditions, subject to the availability of resources, appropriations, and other authorized funds. NOAA is not a formal party to these Covenants and Conditions, and does not possess mandatory legal obligations pursuant to the Covenants and Conditions.

B. NOAA's authority shall be exercised within the terms of these Covenants and Conditions.

C. In order to make reports and recommendations to the Court, NOAA shall have the authority under these Covenants and Conditions:

1. To periodically inspect the TITANIC Collections and the Trustee's operations for the conservation, curation, documentation, and other activities in relation to the STAC. For these purposes, NOAA shall have full access to the TITANIC Collections, the Trustee's facilities and personnel, and any documentation NOAA determines is reasonably necessary to evaluate the condition of the STAC. {36 C.F.R. § 79.11}

2. To consult with, and seek advice from, any entity or individual who may be of assistance to evaluate the condition of the TITANIC Collections, including other federal governmental departments and agencies, and those entities or individuals who have such relevant or appropriate professional or academic credentials. Any written reports and views of such entities and individuals consulted shall be timely shared with the Trustee, which shall have the opportunity to timely respond. {16 U.S.C. § 450rr–3; 66 Fed.Reg. 18911}

3. To make recommendations to the Trustee about measures to be adopted to improve the condition of the STAC. The Trustee shall have the opportunity to respond to such recommendations, and shall subsequently report to the Court how it has implemented, or why it has not implemented, such recommendations.

4. To make recommendations as to the deaccessioning of objects from the STAC, pursuant to the procedures detailed in Covenant and Condition III. C.4, *supra*.

5. To make recommendations relating to the performance guarantee de-

tailed in Covenant and Condition V.D, *infra.*

6. To make recommendations as to whether the Trustee is in significant default of an essential Covenant and Condition, pursuant to the procedures detailed in Covenant and Condition V.E, *infra.*

7. To make recommendations as to the designation of a Subsequent Trustee, pursuant to the procedures detailed in Covenant and Condition VI.E, *infra.*

8. To make recommendations in the event of a Trustee's bankruptcy, pursuant to the procedures detailed in Covenant and Condition VII.D, *infra.*

9. To make recommendations that the Court should appoint experts to offer opinions regarding the compliance of the Trustee with these Covenants and Conditions and/or any other matter relevant to the STAC.

10. To make periodic reports to the Court as to the Trustee's compliance with these Covenants and Conditions.

11. Subject to the availability of resources, appropriations, and other authorized funds, to perform any other functions requested by the Court regarding oversight of the STAC.

12. If NOAA determines it will no longer participate in these Covenants and Conditions, it will provide timely notice to the Court and the Trustee.

D. Performance Guarantees: Trust and Reserve Account.

1. An incumbent Trustee hereby covenants that it will set aside and pay a designated sum of monies into a reserve account (as specified below) separate and segregated from other accounts, which may not be used for general operating or other routine expenses of the Trustee.

2. The payments shall be made out of the money which it may now or later have on hand and available for such purposes commencing with the fiscal quarter in which these Covenants and Conditions are executed and the *in specie* salvage award is granted, and quarterly thereafter in equal amounts of U.S. $25,000 per quarter, as a performance guarantee. The payments shall be adequate so that within twenty-five (25) years from the date hereof, and based upon reasonably anticipated rates of return, there shall be an endowment, the annual income of which (based on reasonable rates of return) would be sufficient to cover the estimated annual costs and expenses of conserving and curating the TITANIC Collections for that year. For these purposes the amount of an adequate endowment will be deemed equal to 5 million dollars (U.S. $5,000,000), which may be adjusted from time to time to address changes in circumstances and inflation. Interest that may accrue on said reserve fund shall be retained in the reserve account until such time as the fund shall accumulate 5 million dollars (U.S. $5,000,000), as that amount may be adjusted from time-to-time as hereinabove provided.

3. Said reserve account shall be and is hereby irrevocably pledged to and held in trust by Trustee for the purpose of providing a performance guarantee for the maintenance and preservation of the TITANIC Collections for the public interest.

4. All monies in the reserve account may be kept in cash or invested in direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States Government, obligations of agencies of the United States Government or certificates of deposit secured by such obligations. In all other respects, investment decisions related to the reserve fund are committed

to the sound business discretion of the Trustee. Interest on such investments and/or any profits realized from the sale thereof shall be deposited in and become a part of the reserve account until the aggregate amount equals 5 million dollars (U.S. $5,000,000), as from time-to-time may be adjusted.

5. No funds from the reserve account may be withdrawn except upon the prior written request of the Trustee with sufficient explanation as to its need and use, and with the approval of the Court. If a deficiency is created in the Reserve Account by reason of a withdrawal either for purposes of maintaining or preserving the TITANIC Collections or any item thereof, then said deficiency in the reserve account shall be made up from the money first available to the Trustee after covering current expenses of maintaining and preserving the TITANIC Collections.

6. In making any determination related to performance guarantees, the Court may request information from the Trustee and/or may convene and conduct an evidentiary hearing.

7. NOAA may submit information and/or prepare a report and recommendation for the Court, as to any issue related to performance guarantees, and the Trustee may make a timely response to such a submission. The Court may consider any information and/or report and recommendation submitted by NOAA.

E. Trustee's Material Default.

1. A "Material Default" is defined to include that conduct or omission by the Trustee, or such conditions in relation to the TITANIC Collections, that seriously compromise and jeopardize the TITANIC Collections and the objective of ensuring that it is available to posterity. Any violation of Covenants and Conditions III.A, III.C, IV.B, and IV.D will normally be assumed to be a material default.

2. Procedures to be Followed in the Event of a Material Default.

a. NOAA may, in a notice directed to the Trustee (or in a report to the Court in the event of extraordinary circumstances) indicate that a material default has occurred, or will imminently occur, and may recommend a means of response or remediation of such default. The Trustee shall have thirty (30) days to respond to such a notice or report, indicating (i) whether its conduct, or the condition of the Titanic Collections, is such as to merit characterization as a significant default, and (ii) what response or remediation efforts have, in any event, been implemented. If NOAA is satisfied with the Trustee's response that shall end the matter, but if not, NOAA may request a further set of responses from the Trustee, or shall direct a report to the Court indicating that a material default has occurred, or will imminently occur, and recommending a means of response or remediation of such default

b. The Court may request information from the Trustee and/or may convene and conduct an evidentiary hearing in order to ascertain whether a material default has occurred, and what steps the Trustee must undertake to respond or remediate;

c. At the conclusion of any evidentiary hearing NOAA may submit additional information and/or prepare a report and recommendation for the Court, as to whether there has been a material default, and whether the Trustee is unwilling or unable to satisfactorily respond or remediate. The

Trustee may make a timely response to such submissions;

d. The Court may consider any information and/or report and recommendation submitted by NOAA and the Trustee;

e. The Court may enter an Order as to whether there has been a material default, and, if so, any such action as the Trustee must make, within a specified period of time, to respond or remediate,

f. If the Court finds that there has been a material default of an essential Covenant and Condition, and the Trustee is unable or unwilling to comply with the Court's order for response or remediation, the Court may order (i) the Trustee to make other reasonable undertakings in order to respond to or remediate the material default; (ii) the Trustee to post additional performance guarantee(s); or (iii) the use of the reserve account in a manner subject to the Court's determination to best protect and preserve the TITANIC Collections.

F. The Continuing Jurisdiction of the Court.

1. The Court shall be deemed to have continuing jurisdiction over the Subject TITANIC Artifact Collection as part of the pending admiralty action.

2. Any Trustee designated under these Covenants and Conditions shall submit itself *in personam* to the jurisdiction of the Court, for the purpose of oversight of compliance with these Covenants and Conditions.

G. Funding of Oversight

1. The Trustee shall, as part of its obligations under these Covenants and Conditions, pay reasonable expenses of court-appointed experts. Such experts may be appointed where necessary and appropriate to assist with any issue or determination arising under these Covenants and Conditions.

2. NOAA may recommend appointment of an expert, or the Trustee may make such recommendation, or the Court may do so *sua sponte*.

VI. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF ITS SALE {U.S. Amicus Br. 14–15; Court 4/15/2008 Order, at 5 & 6 n. 12}

A. The Subject TITANIC Artifact Collection (STAC) may not be sold, transferred, assigned, or otherwise be the subject of a commercial transaction, except as approved by the Court. Such transfer or assignment will be subject to orders of the Court including the provisions of these Covenants and Conditions. {U.S. Amicus Br. 15}

B. These Covenants and Conditions for the STAC shall run in perpetuity and shall be applied to all subsequent Trustees within the scope of their terms. {Court 4/15/2008 Order, at 5}

C. Subsequent purchasers, assignees, transferees, or otherwise of the Subject TITANIC Artifact Collection (henceforth "subsequent Trustees") shall be deemed to be on notice of the restrictions contained in these Covenants and Conditions as constituting an equitable servitude and trust imposed for the public interest and that NOAA may represent the public interest in the STAC and exercise oversight functions in relation to these Covenants and Conditions. NOAA may file or cause to be published such public notice of these Covenants and Conditions as it deems in its discretion to be necessary or convenient to protect the public interest. The Trustee shall execute such documents as may be reasonably appropriate to provide such notice.

D. Any subsequent Trustee must be a qualified institution, as defined in provision II.I, *supra,* and in light of the considerations contained in Annex A, *infra.*

E. Procedure for Designating a Subsequent Trustee.

1. The Trustee may propose to the Court a transaction for the sale, transfer, assignment or otherwise of the Subject TITANIC Artifact Collection. The proposal should include all details of the transaction, shall identify the proposed Subsequent Trustee, and indicate how the candidate Subsequent Trustee is, or will become, a qualified institution, and shall include a signed acknowledgement by the proposed Subsequent Trustee to be bound by these Covenants and Conditions. The procedures outlined in this section (Section VI) of the Covenants and Conditions do not apply, however, in situations where the corporate identity of the Trustee is changed or altered by sale, purchase, merger, acquisition, or similar transaction, the form and purpose of which does not effectuate a change in the management, conservation and curation of the STAC.

2. The Court may appoint experts to conduct and complete due diligence investigations of the candidate Subsequent Trustee, to no less an extent as permitted in regards to the operations of the Trustee. Such experts may, by communication to the Court, Trustee, and NOAA, offer opinions whether (a) the candidate Subsequent Trustee is a qualified institution; and (b) whether the transaction may proceed under the terms and conditions proposed, or whether such must be modified in order that the transaction be in conformance with these Covenants and Conditions.

3. The Court may request information from the Trustee on this matter, and/or may convene and conduct a hearing, in order to ascertain whether the candidate Subsequent Trustee is a qualified institution and whether the transaction may proceed.

4. The Court may consider any information and/or report and recommendation submitted by NOAA as to whether the candidate Subsequent Trustee is a qualified institution and whether the transaction may proceed. The incumbent Trustee may timely respond to such NOAA submissions.

5. The Court may enter an Order indicating whether the transaction may proceed, and (if appropriate) designating the candidate proposed as the next Trustee of the Subject TITANIC Artifact Collection. As part of its Order, the Court may confirm that, in the transfer of the STAC, the disposition of any funds having accumulated in the reserve account established in Covenant and Condition V.D. remains with the former Trustee, provided that the subsequent Trustee immediately replaces any such funds, thereby irrevocably pledging those funds for the purpose of providing for the maintenance and preservation of the TITANIC Collections for the public interest, and undertakes its continuing accretion at not less than its then-current levels, such funds being pledged for the conservation and curation of the TITANIC Collection for the public interest.

F. Special Provisions in the Event of a Transaction with an Overseas Entity.

1. Nothing in these Covenants and Conditions precludes the sale, transfer, assignment or other transaction of the Subject TITANIC Artifact Collection to a qualified institution located or constituted outside the United States ("an overseas entity").

2. An Overseas Entity must make, as a condition of the transaction, the

declaration contained in provision V.F.2, in a form satisfactory to the Court.

3. As ordered by the Court, an Overseas Entity may be required to post an additional performance guarantee as a condition for being confirmed as the Subsequent Trustee, unless:

a. The overseas entity is located or constituted in a State Party to the International Agreement Concerning the Shipwrecked Vessel RMS Titanic, done at London, November 6, 2003, or in a country mentioned in 16 U.S.C. § 450rr–3(a); or

b. The transaction approved pursuant to the procedures indicated at provision VI.E, *supra,* requires that the STAC be leased-back to, or otherwise effectively managed by, a United States entity that has previously served as a Trustee.

4. Any performance guarantee required pursuant to provision VI.F.3 of the Covenants and Conditions shall have such additional purposes and objectives as designated by the Court.

## VII. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF A TRUSTEE'S BANKRUPTCY {U.S. Amicus Br. 16; Court 4/15/2008 Order, at 5}

A. Having been declared that any Trustee's title to and possession and use of the Subject TITANIC Artifact Collection (STAC) pursuant to the *in specie* salvage award is subject to a trust to further the public interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, any Trustee of the STAC that is organized as a business association (whether for-profit, or not-for-profit), shall be required to take all appropriate measures to ensure that these Covenants and Conditions will continue to apply to the STAC for the benefit of the public interest even in the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event.

B. To the extent allowed by federal law, the beneficial interests to the STAC, including the public beneficial interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, shall not be considered as part of the bankruptcy estate of the Trustee in the event of bankruptcy, insolvency, dissolution, winding up, or similar event, and all measures taken by a trustee, debtor-in-possession or similar agent of the Trustee shall be subject to review by the United States District Court for the Eastern District of Virginia to protect the unity and integrity of the STAC under these Covenants and Conditions; provided, however, nothing in this subparagraph shall be construed to deprive the Trustee of any economic benefits relating to the *in specie* salvage award and its title to the STAC consistent with these Covenants and Conditions.

C. Deleted.

D. Procedures in the Event of a Trustee's Bankruptcy.

1. In the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event, the Court may take all appropriate action, within its jurisdiction, to enforce these Covenants and Conditions;

2. The Court may request information from the Trustee and/or may convene and conduct a hearing in order to ascertain whether the Trustee's insolvency bond should be forfeited and recommend the modalities under which the funds will be applied to protect the TITANIC Collections;

3. Deleted.

4. Deleted.

5. NOAA shall have the right to make submissions in the foregoing proceedings and represent the public interest.

6. As set forth in V.F.1, jurisdiction over this matter shall remain in the United States District Court for the Eastern District of Virginia. If, however, another bankruptcy court attempts to exercise jurisdiction over the STAC artifacts, the district court in which the bankruptcy case is pending may have the reference withdrawn under 28 U.S.C. § 157, or transfer venue to this Court under 28 U.S.C. § 1412.

## VIII. OTHER PROVISIONS

A. These Covenants and Conditions constitute the entirety of a Trustee's obligations in regards to the TITANIC Collections.

B. Any controversy or claim arising out of or relating to these Covenants and Conditions shall be within the primary competence of the Court exercising jurisdiction in the pending admiralty action.

C. If any provision of these Covenants and Conditions is found to be unconstitutional or unenforceable by a court or tribunal of competent jurisdiction, such provision shall be severed from the whole and the remaining provisions shall be given full force and effect.

D. These Covenants and Conditions shall be interpreted in accordance with federal law.

### ANNEX A

### Considerations for any Evaluation of Whether an Entity is a Qualified Institution

The following considerations are relevant to a determination whether an entity is a qualified institution within the meaning of the Covenants and Conditions. An entity will be deemed to have the capability to provide adequate long-term conservation and curatorial services when the entity is able to:

(a) Accession, label, catalog, store, maintain, inventory and conserve the TITANIC Collections on a long-term basis using reasonable museum and archival practices; and

(b) Comply with the following, as appropriate to the nature and content of the collection;

(1) Maintain complete and accurate records of the TITANIC Collections, including:

(i) Records on acquisitions;

(ii) Catalog and artifact inventory lists;

(iii) Descriptive information, including field notes, site forms and reports;

(iv) Photographs, negatives and slides;

(v) Locational information, including maps;

(vi) Information on the condition of the TITANIC Collections, including any completed conservation treatments;

(vii) Approved loans and other uses;

(viii) Inventory and inspection records, including any environmental monitoring records;

(ix) Records on lost, deteriorated, or damaged objects within the Subject TITANIC Artifact Collection (STAC); and

(x) Records on any deaccessions and subsequent transfers, repatriations or discards of objects within the STAC;

(2) Dedicate the requisite facilities, equipment and space in the physical plant to properly store, study and conserve the collection. Space used for

storage, study, conservation and, if exhibited, any exhibition must not be used for non-curatorial purposes that would endanger or damage the collection;

(3) Keep the TITANIC Collections under physically secure conditions within storage, laboratory, study and any exhibition areas by:

(i) Having the physical plant meet local electrical, fire, building, health and safety codes;

(ii) Having an appropriate and operational fire detection and suppression system;

(iii) Having an appropriate and operational intrusion detection and deterrent system;

(iv) Having an adequate emergency management plan that establishes procedures for responding to fires, floods, natural disasters, civil unrest, acts of violence, structural failures and failures of mechanical systems within the physical plant;

(v) Providing fragile or valuable items in a collection with additional security such as locking the items in a safe, vault or museum specimen cabinet, as appropriate;

(vi) Limiting and controlling access to keys, the collection and the physical plant; and

(vii) Inspecting the physical plant for possible security weaknesses and environmental control problems, and taking necessary actions to maintain the integrity of the collection;

(4) Require staff and any consultants who are responsible for managing and preserving the STAC to be qualified professionals;

(5) Handle, store, clean, conserve and, if exhibited, exhibit the TITANIC Collections in a manner that:

(i) Is appropriate to the nature of the material remains and associated records;

(ii) Protects them from breakage and possible deterioration from adverse temperature and relative humidity, visible light, ultraviolet radiation, dust, soot, gases, mold, fungus, insects, rodents and general neglect; and

(iii) Preserves data that may be studied in future laboratory analyses. When material remains in a collection are to be treated with chemical solutions or preservatives that will permanently alter the remains, when possible, retain untreated representative samples of each affected artifact type, environmental specimen or other category of material remains to be treated. Untreated samples should not be stabilized or conserved beyond dry brushing;

(6) Store site forms, field notes, artifacts inventory lists, computer disks and tapes, catalog forms and a copy of the final report in a manner that will protect them from theft and fire such as:

(i) Storing the records in an appropriate insulated, fire resistant, locking cabinet, safe, vault or other container, or in a location with a fire suppression system;

(ii) Storing a duplicate set of records in a separate location;

(7) Inspect the collection for possible deterioration and damage, and perform only those actions as are absolutely necessary to stabilize the collection and rid it of any agents of deterioration;

(8) Conduct inventories to verify the location of the material remains, associated records and any other Federal personal property that is furnished to the repository; and

(9) Provide access to the collection by the public and researchers. {36 CFR § 79.9}